EDWARD F. POEHLER, RESPONDENT, v. JOHN G. LONSDALE AND J. M. KURN, TRUSTEES IN BANKRUPTCY OF ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, A CORPORATION, APPELLANTS.—129 S. W. (2d) 59.

St. Louis Court of Appeals. Opinion filed June 6, 1939.

Motion for rehearing overruled June 20, 1939.

*J. W. Jamison, A. P. Stewart* and *C. H. Skinker, Jr.,* for appellants.

*Joseph N. Hassett* and *Vernon L. Turner* for respondent.

SUTTON, C.—This is an action to recover damages for personal injuries sustained by plaintiff in a collision of his automobile with a coal car in defendants' train.

The trial, with a jury, resulted in a verdict and judgment for plaintiff for $1896, and defendants appeal.

Error is assigned by defendants here for the refusal of their instruction in the nature of a demurrer to the evidence. The assignment is put on the grounds, (1) that the evidence as to defendants' negligence was insufficient to take the case to the jury, and (2) that under the evidence most favorable to plaintiff, and under the physical facts in the case, plaintiff was guilty of contributory negligence as a matter of law.

The collision occurred between one and two o'clock A. M. on December 15, 1934, at the intersection of the railway tracks, which run north and south, with Gravois Road, which runs east and west, in St. Louis County. Plaintiff was driving his model A Ford coupe east on Gravois Road. Miss Venita Nelson was riding in the coupe with him.

Concerning the collision and the attendant circumstances plaintiff testified as follows:

"There was a fine mist and dense fog. I could see ahead down the pavement about twenty feet, according to the light shining. I was driving east along Gravois Road on the south side of the pavement, and all at once I struck a train. As I came east on Gravois Road I was driving about twenty miles an hour. I drove about the same speed all the time. I could see the pavement about twenty to twenty-five feet ahead. I ran right on the railroad crossing without any warning. I was not familiar with the highway prior to the accident. I did not know I was approaching a railroad crossing as I was driving eastward. I did not know there was a railroad crossing that crossed there. There was nothing to attract my attention that I was going across a railroad crossing. I had my window half way lowered. Miss Nelson's window was up. I did not hear any noise of any kind as I drove along there. I did not hear any railroad whistle nor engine whistle, nor any railroad bell or engine bell. There were no lights there. I was looking ahead watching the pavement and watching ahead. There were no lights of any kind as I came over there to the crossing. I did not see anything on the crossing. The first time I knew anything about this train is when I woke up in the hospital that morning around 8:30 or 9 o'clock. I never at any time saw any obstruction in the road. The headlights on my car were in good condition. I had recently put in a new battery. The headlights worked off the battery. On an ordinary night when there is no fog or mist I imagine my lights would show about 30 to 35 feet down the pavement, and with the mist and dense fog I could see 20 to 25 feet ahead of me. Going 20 miles an hour I judge I could stop my car in 20 to 25 feet. I did not see the freight train nor the freight car on the crossing. I did not slow up my

car any prior to colliding with the freight car. It was not raining; there was just a mist and dense fog. My lights were focused on the pavement about 20 to 25 feet ahead of me. The dense fog kept me from seeing the freight car. I could see the pavement all right, so far as my lights were shining, 20 to 25 feet, but straight ahead it was just dark, couldn't see into the fog. The main beam of my headlight was focused on the pavement, and the fog kept the light from reflecting back, that is, I couldn't see this freight car because of the fog. The headlights on my car were the ones that came with it. I had my headlights turned on bright that night, and they were focused down on the pavement about 20 or 25 feet ahead of me.''

Venita Nelson testified as follows:

''We were driving that night about 20 miles an hour. There was a fog in Gravois Road. I could see about 20 or 25 feet ahead of me, that is, I could see the beam of the headlight on the pavement, could not see any surrounding objects. I could see the pavement. I saw nothing across the road. I was looking ahead and listening. I did not hear any whistle or bell or noise of any kind. I had no warning of any kind that we were about to run into anything. We were driving along at about twenty miles an hour, everything normal, and then the lights went out. The first I remember about this accident was about five weeks later. I was unconscious that long. The headlights were in good condition so far as I could tell. There was a dense fog at the time of the accident. Just prior to the collision I was looking ahead. There were no lights of any kind ahead that I could see. I did not know we were coming to a crossing. There were no lights of any kind ahead. The only lights around there were the lights on the automobile. I did not see anything to indicate that we were coming to a railroad crossing or coming to a train across the crossing.''

All the witnesses agreed that the night was dark and cloudy, though the trainmen stated there was no fog.

The evidence shows that Gravois Road was a four-lane road paved with concrete and was about fifty feet wide. It carried a vast amount of vehicular traffic. It was one of the main arteries of travel leading into the City of St. Louis, and was designated and known as highway 30. It was a direct cutoff from South St. Louis to U. S. Highway 66 and 67. The railroad crossing where the collision occurred was just a few miles from the St. Louis city limits. There were no gates or signal lights or bells of any kind at the crossing. There was a wooden crossarm on the north side of the highway about twelve feet west of the tracks and about ten feet north of the north curb of the highway. There was no light on it. There was not any crossarm or warning signal of any kind at the intersection on the south side of the road. There was no light of any kind to light up the intersection or the train or cars standing across the intersection. There was a little shanty for the watchman at the southeast corner of the intersection. The rail-

road tracks were level with the concrete pavement, and there was nothing about the construction of the tracks to indicate their presence to a traveler approaching them from the west. The pavement was level and smooth across the tracks. For a distance of about three hundred feet there was no grade approaching the tracks from the west, the pavement being practically level west of the tracks for that distance. The pavement was light. There was evidence of a State highway sign up on the road three hundred to six hundred feet west of the intersection showing a cross with red buttons, located in a ditch at the side of the road about ten feet south of the curb. It was about three feet high and below the level of the pavement. A deputy sheriff testified that no stranger going over the road approaching the railroad tracks from the west would know that the railroad tracks were there, "unless he noticed this road sign, which very few people noticed." Plaintiff testified that he did not see it. The deputy sheriff further testified that this was a dangerous crossing, and that ordinarily there was a heavy vehicular traffic over this highway all day long and continuing up to three o'clock in the morning. He also stated that if one were not familiar with the road he would not know that there was a railroad track there, that there was nothing there to indicate to the traveler that he was coming to a railroad crossing. One of defendants' witnesses testified as to the heavy traffic passing over this crossing, stating that it came from both ways "like a swarm of bees."

The freight car with which plaintiff's automobile collided was a coal car loaded with coal. The car was painted black. Prior to the collision the locomotive had proceeded north over the crossing and had stopped. The coal car was the fourth car from the locomotive. It was thirty-six feet long, inside measure. It was standing across the pavement, the front trucks to the north of the center line of the pavement and the rear trucks at the south edge of the pavement. The bottom of the coal car was three to three and one-half feet above the pavement, and slightly lower than the height of the top of the hood of the coupe. So that there was nothing between the trucks underneath the coal car to obstruct the beams from the headlights of the coupe as it approached the coal car. After the collision the hood of the coupe was wedged under the coal car partwise, three or four feet south of the front trucks, that is, between the front and rear trucks. The coupe was partly towards the center of the road but still on the south side of the center of the road. The whole front part of the coupe was damaged. The top of the hood was crushed back almost to the windshield.

The defendants' watchman was on duty at the time of the collision. He was to the east of the train, with his lanterns, one red and one white. He was to the north of the center of the highway, and was so positioned with respect to the train that his lights were not visible to plaintiff as he approached the crossing.

All of the testimony of the train crew shows that the bell of the locomotive was shut off after it crossed over the highway, and that the bell was not rung nor the whistle sounded after the locomotive passed over the highway, and there was no noise from the locomotive or the train after it stopped.

Plaintiff read to the jury from the deposition of defendants' watchman the following:

"Q. The train got there about fifteen minutes before the accident? A. No, I won't say fifteen minutes.

"Q. Well, what will you say? A. I don't say over ten minutes at the very most to my judgment and opinion. I didn't look at my watch understand."

Plaintiff's injuries as shown by the attending physician consisted chiefly of a lacerated scalp wound, a wrenched back, fractured skull in the frontal region, a fracture of the lower third of the right tibia.

Defendants' fireman testified that his locomotive stopped about two hundred feet north of the crossing; that he saw plaintiff's car approaching the crossing after his locomotive stopped; that he saw the approaching car when it was about 150 to 200 feet from the train; that he judged it was running thirty-five miles an hour; that he saw the car until it collided with the train; that the speed of the car did not change any as it approached the train; that the headlights of the approaching car were burning and appeared to be normal; that the whistle cord of the locomotive was right by him; that he watched plaintiff's car approaching the train thirty-five miles per hour without slackening its speed, but he did not sound the whistle.

Another witness for defendants testified that he saw the headlights of the approaching automobile when it was eight hundred feet distant from the train.

Defendants' forward brakeman testified that he was riding in the cab of the locomotive, and dropped off at the crossing to uncouple the coal car which was to be set out there, and that the collision occurred about twenty seconds after the train stopped. The rear brakeman testified that he was riding in the caboose approximately one-half mile south of the crossing, that he did not hear the collision, but when he arrived at the crossing the unconscious occupants of the coupe had not yet been removed from it, and he gave immediate aid to them. It appears that he was the first to reach them and give them aid after the collision. He said he walked from the caboose to the crossing after the train stopped.

E. O. Wollan, a professor of physics in Washington University, testified, for plaintiff, as follows:

"The study of physics includes the action of rays of light and resistance to the rays of light. In addition to my teaching, I also conduct experimental work in connection with the subject of physics. I drive an automobile.

"Q. Now, professor, the sight—the visibility of objects by light being cast upon them, is carried out in what manner? A. Well, the light falls on a body, and some of it is absorbed, and some of it is diffusely reflected. Of course, if it is a mirror surface, then we say it is purely reflected; otherwise we speak of it as being diffusely reflected from the body.

"Q. Now, in connection with the light, you say, of an automobile, are there certain rays known as direct rays of light, and others as diffused rays, or what do you call the others besides your direct rays? A. Well, I suppose all the rays coming from a headlight of a lamp would be—you speak of them as direct rays, but a big share of them are confined in a very intense bundle of radiation. And then there are some of them that are on the outer—around the edge, of much less intensity than in the central bundle of the beam.

"Q. Now assume a situation where an automobile is traveling down on a light concrete highway, and assume that the direct focus of the headlights of the car are a distance of some twenty to twenty-five feet in front of the automobile. Now, assume that this automobile is approaching a coal car, the bottom of which is about three feet or a little more above the level of the highway. Now, about what percentage—assume now there is a dense fog surrounding the place where this coal car is located, and that this fog covers the highway as the automobile approaches the coal car. Now about what percentage of these rays of light from this automobile would be reflected back from the pavement, from the white pavement? A. Well, those rays which actually hit the pavement from the automobile something like fifty per cent of them would be scattered from the pavement, about fifty per cent absorbed. By being absorbed I mean that the rays that actually hit it do not leave the pavement at all; that part is absorbed. The other fifty per cent leaves the pavement in various directions, and not all of it is in the direction of the human eye; probably a very considerably smaller percentage would be in that direction. You mentioned that the light beam from the automobile struck the pavement at about twenty to twenty-five feet from the automobile. That means that the intense beam of the light would be going in a line from a height of three feet from where the headlights are, and strike the pavement at about twenty-five feet. Then there would be, of course, some light above this beam, but it would be very much less intense than the main light in the main beam. As I have pointed out, there is a rather small percentage of light above a sharp line, especially when the light is shining in a downward position. Let us say, if we had a coal car advanced up to, say twelve and a half feet. That would be half of the twenty-five feet distance in which the beam hits the pavement. Then this three feet—the coal car is three feet from the pavement, and halfway from the pavement to the lights you would have the main beam of the light would be one and a half feet from the

bottom of the coal car, so you have a distance of one and a half feet from the main beam of the light up to the bottom of the coal car when the coal car is at only twelve and a half feet from the automobile. Now, we mentioned that the light falling on the pavement, fifty per cent of that is reflected. It is a light concrete pavement; that doesn't mean that fifty per cent is coming back to the driver. The coal car is black, and in the case of black paint less than ten percent of the light would be reflected. That is not taking into consideration anything of the fog. It is admitted, of course, that the man could see the pavement; some light is reflected back through the fog, and that, of course, depends on the density of the fog.

"Q. Now, you say that of these rays that are sent out here on a black object, like a coal car, that that coal car will absorb only about ten per cent? A. May I correct that? Will reflect back about ten per cent.

"Q. That is, assuming that there is nothing in between the driver and this object; is that correct? A. Yes.

"Q. Now, assume, though, that between this driver and the coal car that there is a dense fog here? A. Yes.

"Q. Now, what effect does that fog have upon this ten per cent of light which this coal car has reflected back? A. Well, there will be, of course, an absorption of the light in going from the automobile to the coal car, and then of the light which gets through only about ten per cent of which will be scattered back in all directions and then in going back to the observer's eyes, the same—approximately the same fraction of that will be absorbed away, so, presumably, you have a very large decrease of the intensity of the light leaving the coal car to the observer's eyes.

"Q. In other words, by the time these reflected rays get back to the eye of the driver they are practically *nil*; is that right? A. Well, *nil*.

"Q. Now, with respect to the opportunity of a driver being able to see an object in front of him through a dense fog, which presents the greater opportunity of being seen, a large coal car which completely crosses the highway or some small defined object? A. I should say that a small defined object would be much more likely to attract the driver's attention than a large black object as this coal car was.

"Q. And why is that so? A. Well, we have admitted there is a rather small amount of light coming from this coal car, and if you have a small object with a small amount of light coming back from it there would be an outline which would be more apt to attract his attention. After all, the light coming back through the fog itself is diffused, and in addition to that you have behind it a black background, that doesn't lend itself very readily to be seen, while you have standing out in that a dark shadow there is more likelihood, it seems to me, of the thing being observed than in the case of a broad body.

"Q. In other words, this large black object has a tendency to sort of blend with the surrounding conditions more than a sharply defined small object? A. That is true.

"Q. A fog is a very serious thing, so far as interfering with vision, isn't it? A. Yes, sir.

"Q. And, of course, the more dense the fog the more it interferes with vision? A. Yes, sir."

There could hardly be a serious question that the evidence is sufficient to make out a submissible case of negligence on the part of the defendants. [Sec. 4830, R. S. 1929, Mo. Stat. Ann., sec. 4830, p. 2200; Sec. 4757, R. S. 1929, Mo. Stat. Ann., sec. 4757, p. 2140; Elliott v. Missouri Pacific R. Co. (Mo. App.), 52 S. W. (2d) 448; Homan v. Missouri Pacific R. Co., 334 Mo. 61, 64 S. W. (2d) 617; Toeneboehm v. St. Louis-San Francisco R. Co., 317 Mo. 1096, 298 S. W. 795; Roshel v. Litchfield & Madison Ry. Co. (Mo. App.), 112 S. W. (2d) 876; Hofstedt v. Southern Pacific Co. (Calif.), 1 Pac. (2d) 470; Spiers v. Atlantic Coast Line R. Co. (S. C.), 178 S. E. 136; Richard v. Maine Central R. Co. (Me.), 168 Atl. 811.] Nor do we think the evidence shows plaintiff guilty of contributory negligence as a matter of law. [Love v. Kansas City (Mo. App.), 118 S. W. (2d) 69; Kendrick v. Kansas City (Mo.), 237 S. W. 1011; Roper v. Greenspon (Mo.), 198 S. W. 1107; McGrory v. Thurnau (Mo. App.), 84 S. W. (2d) 147; Williams v. City of Mexico (Mo. App.), 34 S. W. (2d) 992; Shelley v. Pollard (Ga.), 189 S. E. 570; Mallett v. Southern Pacific Co. (Calif.), 68 Pac. (2d) 281; Ross v. Hoffman (Mo. App.), 269 S. W. 679; Powell v. Schofield, 223 Mo. App. 1041, 15 S. W. (2d) 876; Sheffer v. Schmidt, 324 Mo. 1042, 26 S. W. (2d) 592; Bedsaul v. Feeback, 341 Mo. 50, 106 S. W. (2d) 431; Main Street Transfer & Storage Co. v. Smith, 166 Tenn. 482, 63 S. W. (2d) 665, 1. c. 668; Morehouse v. Everett, 141 Wash. 399.]

In the Shelley case the court said:

"Where a person traveling in an automobile along the public highway on a dark, cloudy night about 11:30 o'clock while there is 'a fine mist of rain,' approaches a railroad crossing upon which a string of freight cars is standing, and has no knowledge of the presence of the cars on the crossing and there are no lights, bell, gong, sign, or other device to warn the traveler or other persons approaching the crossing of the presence of the cars on the crossing, and there is no watchman guarding the crossing, and there are no signs erected at or near the crossing to warn him of the presence of the crossing, and he is not aware that he is in the immediate vicinity of the crossing, and where, on account of the cars being a dark color, the lights of the automobile do not reflect upon the cars, so as to warn the traveler of the presence of the cars, until he is approximately within ten or fifteen feet of them, and is therefore afforded no opportunity to apply the brakes and stop the automobile, which is running between fifteen

and twenty miles an hour, before running into the cars, and where the cars are standing on the main track remote from the station or any sidetrack and there is no reason for the traveler to anticipate the presence of the cars standing on the track at the crossing, the traveler in running into the string of cars is not, as a matter of law, guilty of negligence barring a recovery and proximately causing the injuries."

In the Mallett case, wherein the driver of an automobile was allowed to recover for injuries sustained in driving into a gondola across the street where she had no warning that the train was on the crossing, the court said:

"In spite of the theory that the rays of light from the standard headlights of an automobile which are required by the provisions of the Vehicle Code of California (Stat. 1935, p. 201, sec. 618 *et seq.*), within specified limited distances are presumed to disclose to view an object, it is common knowledge that a black stationary object against the dark background of a highway is difficult to see on a dark night, even with the aid of standard headlights. Obviously, the color of an object on the highway on a dark night, and the presence of other objects which may deepen the shadows in that vicinity, must be considered in determining how clearly it may be seen by means of standard automobile headlights. For the reason that standard headlights of an automobile do not clearly illuminate the dark surface of a highway, the motor vehicle department paints a white stripe in the center thereof. In the case of Los Angeles & Salt Lake R. Co. v. Lytle, 56 Nev. 192, 47 Pac. (2d) 934, 938, 52 Pac. (2d) 464, which involved a collision in the nighttime between an automobile and a stationary gondola car under circumstances somewhat similar to this case, the court said:

" 'The extent to which a black surface will absorb the light of an automobile is known to every motorist.' "

In the Sheffer case our Supreme Court said:

"In the case at bar it is not necessary to apply the hard and fast rule, even if such a rule were proper, that the driver of an automobile at night must drive at such a rate of speed that it can be stopped, in time to avoid an obstruction discernible within the driver's length of vision ahead of him. The author of the note in 44 A. L. R. 1403, expresses the opinion that the rule is too broad, and the duty should be limited to the observation of conditions which the driver of the car should reasonably anticipate."

In the Bedsaul case our Supreme Court quotes with evident approval from Murphy v. Hawthorne (Ore.), 244 Pac. 79, as follows:

"Each case must be considered in the light of its own peculiar state of facts and circumstances. After all, the test is, what would an ordinarily prudent person have done under the circumstances as they then appeared to exist? Can we say that all reasonable minds would

reach the conclusion that plaintiff failed to exercise due care to avoid this collision? We think not. Plaintiff had a right to assume, in the absence of notice to the contrary, that defendant would not put this dusty, gray colored truck on the highway after dark without displaying a red light on the rear thereof. If the truck had been lighted, the jury might well have drawn the reasonable inference that plaintiff would have been able to avoid striking it.''

In the Morehouse case the court quotes and approves the rule as follows:

''One of the respondents testified to the effect that the fog lay in banks or strips, in places not so dense as to interfere with a reasonable view ahead, but, proceeding, they came into places where the fog was so dense that the white light of the headlights was mirrored back to the driver and he could see nothing in advance of his automobile. Under such conditions, shall a driver stop in the fog bank until the fog clears? If one does so, all must do so, or the danger would be thereby increased; and if all stop, how shall anyone reach his destination? It seems to us in reason that traffic must be permitted to move on the highway at all times, but that, in driving through a fog bank, each driver must do so in a careful and prudent manner with due regard for the safety of others, and what is careful and prudent under the particular conditions shown will usually be a question for the jury.''

Defendants' view leads inevitably to the conclusion that a motorist driving in the nighttime in the midst of a dense fog must drive as though he supposed himself at all times approaching an unlighted and unguarded railroad crossing, devoid of warning sounds, signal lights, or signal bells, and without signboards so placed as to be easily seen by the motorist even in broad daylight. We decline to adopt such view.

Nor do we think that we ought to blandly set at naught the positive testimony of plaintiff and his guest that though looking ahead they did not see the black coal car in the dense fog before the coupe ran into it as of no probative value because in conflict with known physical law. We must consider that the coupe was running forward in the dense fog at a speed of twenty miles per hour. Even at this moderate speed the car was running thirty feet in one second, ten feet in a third of a second, five feet in one-sixth of a second. The main beams of the forward moving headlights passed under the black coal car a foot and a half below the bottom of the car even when the coupe was within 11½ feet of the car. We do not know of any physical law that would justify the court in holding that a motorist looking ahead, under such circumstances and conditions, must see and recognize a black coal car before colliding with it.

Plaintiff may not be held to be guilty of negligence as a matter of law unless the evidence is so clear that reasonable minds must reach the conclusion that plaintiff failed to use due care. If reasonable

minds may differ, the issue is for the jury. [Clark v. Atchison & Eastern Bridge Co., 324 Mo. 544, 24 S. W. (2d) 143; Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S. W. (2d) 865.]

State ex rel. Kansas City Southern Railway Co. v. Shain (Mo.), 105 S. W. (2d) 915, relied on by defendants, is clearly distinguishable on its facts from the case at bar. In that case the driver's vision was obstructed by snow and dust blown in front of him by a gust of wind. It gave the atmosphere a gray coloring. It was not snowing. It was a clear night. The driver was familiar with the railroad crossing and knew that he was approaching it. He knew where he was. When within ten or twelve feet of the crossing he brought his car almost to a stop. He knew where the crossing was and knew he was ten or twelve feet from it then.

Defendants urge that plaintiff was guilty of negligence *per se* because his own testimony shows that his headlights were not of sufficient power to reveal objects 150 feet ahead under normal atmospheric conditions, as required by section 7778, Revised Statutes 1929, Mo. Stat. Ann., sec. 7778, p. 5222. We think defendants misapprehend plaintiff's testimony. It is true plaintiff stated that his lights on clear nights would light up the pavement in front of his car thirty to thirty-five feet ahead, but the statute requires that the main beams of light shall be turned down on the pavement so that it will not glare on the eyes of approaching drivers. Clearly, plaintiff was testifying concerning the main beams of light focused ahead of him on the pavement, not about what the other rays of light would disclose under normal atmospheric conditions. He was not asked and did not testify concerning his lights revealing objects 150 feet ahead on a clear night with no mist or fog interfering. His other testimony was to the effect that his car had good strong lights, that he had a new battery, and one of defendants' own witnesses testified that he saw his lights coming down the highway eight hundred feet away. We do not believe that the testimony should be regarded as conclusively showing that plaintiff's headlights did not fully comply with the statute.

We conclude that the instruction in the nature of a demurrer to the evidence was rightly refused.

The Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly affirmed. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.