Felix Albertson, Plaintiff-Appellant, v. Wabash Railroad Company, a Corporation, Defendant-Appellant, and W. E. Wolfe, Defendant-Respondent, No. 42663—253 S. W. (2d) 184.

Division Two, November 10, 1952.

Motions for Rehearing or to Transfer to Banc Overruled, December 8, 1952.

*E. E. Thompson, Eugene R. Brouse* and *Sam Mandell* for plaintiff-respondent Felix Albertson; *Popham, Thompson, Popham, Mandell & Trusty* of counsel.

*Joseph H. Miller, David R. Hardy, Sam B. Sebree* and *Sebree, Shook, Hardy & Ottman* for appellant Wabash Railroad Company and respondent William E. Wolfe.

698

BARRETT, C.—Felix Albertson was a guest in William F. Elam's 1938 Plymouth sedan when it ran into an oil tank car standing on the Wabash crossing in Henrietta, a village in Ray County, about 11:20 p. m. on the 18th day of April 1947. To recover damages for his resulting injuries Albertson instituted this action against the Wabash Railroad and William E. Wolfe, a flagman. At the close of the plaintiff's evidence the trial court directed a verdict in favor of Wolfe, and the plaintiff has appealed from that judgment.

A jury has found that Albertson's injuries were proximately caused by [186] negligence on the part of the railroad, and, accordingly, awarded him $15,000. The railroad has appealed from that judgment. Upon the railroad's appeal the primary question is whether there is evidence from which the jury could reasonably find the existence of special circumstances rendering the crossing peculiarly hazardous, if not Albertson, even though a guest, is not entitled to recover; and, conversely, if reasonable minds could differ as to the sufficiency and probative force of the evidence, the railroad's liability and Albertson's contributory negligence were questions for the jury to resolve. Three of the leading and contrasting cases in this jurisdiction are State ex rel. Thompson v. Cave, 358 Mo. 414, 215 S. W. (2) 435, State ex rel. Kansas City Southern Ry. Co. v. Shain, 340 Mo. 1195, 105 S. W. (2) 915, and Carson v. Baldwin, 346 Mo. 984, 144 S. W. (2) 134.

Elam and his brother-in-law, Vanderpool, lived on farms in the Cowgill community. On April 18th Elam was busy sowing oats. About 9:15 he and Vanderpool picked up their friend Albertson in Cowgill and the three of them started to Richmond, twenty-seven miles distant, so that Elam could talk to a man by the name of Yates about renting some land. Just before they reached Richmond they picked up two young women "hitchhikers," and in Richmond they all stopped in the "restaurant taxicab stand" and drank coffee and cokes. Elam was unable to locate Mr. Yates by telephone, the girls were going to Lexington, and Albertson thought he might talk to a night watchman at the sales barn in Lexington about some posts his son-in-law had left there for sale, and Elam "got to talking about he ought to take the girls over there" and, everything considered, they decided to drive to Lexington. As they were leaving the village of Henrietta on Highway 13, about 11:20 p. m., the Plymouth sedan ran into an oil tank car, the sixth of fifty-nine cars in a freight train, standing on the Wabash crossing. The train had been stopped on the crossing about five minutes and was there for the purpose of "taking on water."

The oil tank car, 35 feet 6 inches long, was so stopped that its wheels were at the furthermost edges of the highway crossing. The cylindrical tank car was painted black and upon its sides, in white, were the letters "G A T X" followed by five numerals 7 inches in height and spaced 9 inches apart. The brake cylinder and reservoir for the brakes beneath the car were 1 foot and 4 inches and 1 foot and 8½ inches above the ground, and the running board around the tank was 3 feet 9½ inches above the ground, while the height of the tank was 11 feet and ¾ inches from the top of the rail. The solid beam under the tank was 2 feet 3⅛ inches from the top of the rail.

Highway 13, a concrete roadway, goes directly through Henrietta and in its southern outskirts are the tracks of the Santa Fe Railroad.

There are four or five of these tracks, a main track, a passing track and two or three switch tracks. Three hundred and sixty-one feet south of the Santa Fe tracks, at the southernmost limits of the town, a single track of the Wabash Railroad intersects the highway and there is a slight downward curve, four degrees, in the highway at this point. There are no warning or crossing signs or signaling devices on the north side of the Wabash tracks. There is a cross-armed signal on the south side of the track but that signal was obscured by the train. Between the Santa Fe tracks and the Wabash tracks there is an oil station and a hotel on the west side of the highway. There are no lights at the Wabash crossing. However, at the time of the collision, there was a light on the front of the hotel, sixty-four feet north of the crossing, and there was a street light on a pole still farther north of the hotel, and there was a light in the oil station nearer the Santa Fe tracks. Ten feet south of the Santa Fe tracks is a watchman's shanty used by the flagman, Wolfe. It was his duty to "flag" both the Santa Fe and the Wabash crossings.

The brakes on Elam's Plymouth had been recently overhauled and were in good condition. The seal beam headlights were also in good condition but on that night, because [187] of mist and fog, illuminated the highway "not much over 50 feet on brights" and on "dims wouldn't have reached out that far." As the freight train came into Henrietta Wolfe stood about twenty-five feet north of the Wabash tracks and flagged the crossing with his electric lantern until the train blocked or covered the crosing. As the train blocked the crossing he turned and walked back towards his shanty and was close to it when the Plymouth sedan passed him traveling at a speed of about twenty-five miles an hour. He heard the noise and turned around as the automobile crashed into the tank car 350 feet away. Elam, Vanderpool and Albertson testified that it had been raining and that at the time of the crash there was some moisture. Albertson said, "Some fog there," Vanderpool said, "It was misting and foggy," and Elam said, "It was misting and raining." (The railroad's witnesses testified that it was dark and "cloudy" but that there was no moisture or fog. There was also testimony that the three men in the automobile had been drinking mint flavored gin.) The driver and occupants of the automobile said that the one windshield wiper was working and that they were all looking straight ahead and could see for a distance of thirty to thirty-five feet. They were not familiar with the crossing, saw no lights or signals, slowed down and crossed the Santa Fe tracks at a speed of about twenty-five miles an hour and after they had traveled about 300 feet and were within ten feet of the crossing, some said two automobile car lengths, for the first time saw the tank car. It was then too late, after a quick application of the brakes, to avoid crashing into the tank car. Because of the downgrade the automobile lights were not focused directly upon the tank

car, and there was testimony by an expert, an "illuminating engineer," that the black tank car reflected but a small percentage of the light.

The railroad analyzes the circumstances and insists that they do not constitute special circumstances rendering the crossing peculiarly hazardous and, therefore, there was no breach of duty or negligence upon the part of the railroad. A railroad has the right, to stop its trains upon public crossings, and, in normal circumstances, the presence of the train upon the crossing is adequate notice to the traveling public that the crossing has been preempted and additional signals of warning are not required. Dimond v. Terminal R. Assn., 346 Mo. 333, 347, 141 S. W. (2) 789, 795. The rationale of the rule is that a motorist is also required to exercise due care in approaching railroad crossings, and, if the conditions are such that a motorist, driving a properly equipped automobile and exercising due care for his own safety, should see and observe the obstructed crossing in time to avoid a collision, the railroad may assume that he will do so and is not required to take additional precautions. State ex rel. Kansas City So. Ry. Co. v. Shain, supra. On the other hand, if there are circumstances rendering the obstructed crossing peculiarly hazardous so that a motorist even though exercising due care for his own safety may nevertheless collide with the standing car the railroad is obliged to take additional precautions to prevent a collision. Annotation 161 A. L. R. 115.

It has been determined that the mere downward slope of a public highway toward a crossing, naturally causing automobile lights to be deflected downward and beneath a standing boxcar, and the mere dark color of the surface of the road and the drab color of the boxcar are not such circumstances as to render an occupied crossing unusually hazardous within the meaning of the rule. State ex rel. Thompson v. Cave, supra. The mere fact that the driver and occupants of the automobile were unfamiliar with the crossing and that the highway was heavily traveled are not circumstances making an obstructed crossing peculiarly hazardous. Atchison, T. & S. F. Ry. Co. v. Templar, 204 Okla. 460, 230 Pac. (2) 907; Bledsoe v. M., K. & T. R. Co., 149 Kans. 741, 90 Pac. (2) 9. It has been held that the presence of fog and mist, standing alone, were not such factors as to require additional precautions, that the motorist was under a duty to exercise care commensurate with the hazard to which he was exposed. Hicks v. C., M., St. P. & P. R. Co., (Mo. App.) 233 [188] S. W. (2d) 787; O'Keefe v. Wabash R. Co., 185 F. (2) 241; Dilliner v. Joyce, 233 Ia. 279, 6 N. W. (2) 275; Killion v. C., M., St. P. & P. R. Co., 107 Ind. App. 527, 25 N. E. (2) 647; Webb v. Ore., Wash. R. & Nav. Co., 195 Wash. 155, 80 Pac. (2) 409. It would serve no useful purpose to attempt an analysis and reconciliation of all the cases, the general rules and principles are well known and have been applied in the particu-

lar circumstances to boxcars, coal cars, refrigerator cars and an oil tank car in a moving train. Bledsoe v. M., K. & T. R. Co., supra. In all the cases in which liability has been denied the decisive factor has been that there was no illusion of safety to the motorist or his guest in the particular circumstances. It is not necessarily that the circumstances create "a trap" for the unwary motorist, or the mere presence or absence of one or more of these particularly detailed factors, fog, snow, topography of highway, lack of warning devices or type of railroad car that renders the crossing peculiarly hazardous so as to require precaution on the part of the railroad in addition to the mere presence of the standing train. The test of liability on the part of the railroad and of due care upon the part of the motorist is whether, all the circumstances considered, an illusion of safety is created. If the motorist is exercising the requisite care for his own safety but the particular circumstances nevertheless create an illusion of safety, it is for the jury to say whether the obstructed crossing is unusually hazardous and whether in the circumstances the railroad has likewise fulfilled its obligation to the traveling public.

To illustrate, in Carson v. Baldwin, 346 Mo. 984, 144 S. W. (2) 134, "the flat car which blocked the street saddled it squarely so that only the narrow edge of the platform of the car would be visible to persons coming along the street; the car was not in motion, but was at rest and silent; the crossing was unlighted on the side plaintiff was approaching; a boxcar standing on an adjoining track blocked the view; the street was a heavily traveled one in Rich Hill; the surface of the street inclined down to the tracks which tilted the beam of the headlights away from the edge of the platform of the car; a light fog or mist reduced visibility to a slight degree." There was no warning to the public other than the presence of the flatcar and it was held that these facts constituted special circumstances from which the jury could find that the crossing was so unusually hazardous as to require the additional precautions of a watchman or a warning light. See also Homan v. Missouri Pac. R. Co., 334 Mo. 61, 64 S. W. (2) 617; Elliott v. Missouri Pac. R. Co., 227 Mo. App. 225, 52 S. W. (2) 448; Poehler v. Lonsdale & Kurn, 235 Mo. App. 202, 129 S. W. (2) 59.

In this case we have the presence of the detailed facts of the standing oil tank car, black in color, a slightly curving downgrade highway, no warning signals of any kind, and a cloudy night, if not misty and foggy. But these are not the decisive factors upon which reasonable men might differ as to whether they constituted special circumstances rendering the crossing peculiarly hazardous. In addition to the presence of these important factors there are other compelling circumstances creative of the illusion of safety to motorists properly using the highway. As we have said, the Wabash crossing is at the southern-most edge of the town of Henrietta, it is in fact the "city limits" of the town, and the beginning of "open country." The motorist, in

traveling Highway 13, and the highway is the principal street, crosses the streets and passes the houses and business buildings of the village, and then crosses the four or five tracks of the Santa Fe Railroad. Three hundred and sixty-one feet beyond the Santa Fe tracks, unexpected to the uninitiated, is the single, unlighted, unguarded Wabash crossing where even a careful driver might reasonably expect open country and an open road. Or, if the crossing is occupied by a black oil tank car on a cloudy or foggy night, a warning from a flagman or some member of the full train crew. All in all reasonable minds could certainly differ as to whether these special circumstances created an illusion of safety and thus rendered the occupied crossing peculiarly hazardous and, therefore, the railroad's negligence, including proximate [189] cause, and the plaintiff's due care were all questions for the jury to resolve. Carson v. Baldwin, supra; Elliott v. Missouri Pac. R. Co., supra; Poehler v. Lonsdale & Kurn, supra; Homan v. Missouri Pac. R. Co., supra; annotations 15 A. L. R. 901; 99 A. L. R. 1454; 161 A. L. R. 115.

As indicated, the plaintiff's evidence, responsive to the requirements of the rule, tended to show special circumstances rendering the crossing "unusually" or "peculiarly" hazardous. Unusually or peculiarly hazardous crossing in the circumstances is the very essence of the plaintiff's cause of action and the essential, ultimate issue to be found by the jury. Carson v. Baldwin, supra; State ex rel. Thompson v. Cave, supra. The plaintiff's evidence consisted of photographs, plats, expert testimony, the testimony of the plaintiff and the occupants of the automobile as well as the testimony of others familiar with the crossing. In addition, the plaintiff called as a witness the Secretary of the Public Service Commission of Missouri and through him introduced in evidence as an "admission" an application filed with the Commission in 1941. The railroad insists that this evidence was improperly admitted, that it was prejudicial, and because of its reception in evidence that it is entitled to a new trial. The plaintiff contends that the application was an admission by the Wabash that its crossing was inadequate, unsafe and hazardous and therefore competent and admissible. The plaintiff also argues that if the document was not competent that it was merely cumulative and therefore harmless error.

The application before the Public Service Commission is styled "In the matter of the application of the State Highway Commission of Missouri, The Atchison, Topeka and Santa Fe Railway Company, and the Wabash Railway Company and Norman B. Pitcairn and Frank C. Nicodemus, Jr., Receivers thereof, for permission to effect an overhead crossing and for permission to close an existing grade crossing, Applicants, vs. City of Henrietta, Defendant." The application to the Commission recites that the State Highway Commission has charge of the highways of Missouri and that the two railroads

operate railway systems, portions of which are in the vicinity of the proposed crossing and "That, pursuant to the 'Rules and Regulations for Carrying Out the Provisions of Section 8 of the Act of June 16, 1936 (Public 686—74th Congress) which Relate to the Elimination of Hazards to Life at Railroad Grade Crossings, in accordance with the Provisions of the Federal Highway Act,' the applicants propose to construct an overhead crossing in Ray County, in the City of Henrietta, where Route 13 crosses the tracks and right-of-way of the Railroads to replace an existing grade crossing which has become *inadequate and unsafe for present-day traffic."* The application then recites that the proposed crossing is feasible, practical, economical and that the parties had agreed upon the manner of the crossing and its expense, and *"That proposed overhead crossing will replace and eliminate, in so far as public travel is concerned, a dangerous grade crossing* located approximately three hundred (300) feet west of proposed overhead crossing, *and that the safety and convenience of the traveling public require the closing and abandonment of said dangerous grade crossing upon completion of proposed overhead crossing and highway at said place."* There was a prayer for consent to the construction of the overhead crossing and *"that the Commission order said dangerous crossing closed and abandoned."* The application was signed by the chief engineers of the two railroads and the Highway Department's engineer of grade separations.

Unless excluded by some rule of policy or principle of law, any evidence that is logically probative, including admissions, is competent and admissible. An admission, in general, is a conscious or voluntary acknowledgement by a party of the existence of certain facts relevant to the cause of the party's adversary, a statement against interest, unfavorable or inconsistent with the facts now claimed by the party making the statement. 31 C. J. S., Sec. 270, p. 1022. The basis of the admissibility and competency of admissions is their character or quality of inconsistency. [190] 4 Wigmore, Evidence, Sec. 1048, p. 2. The basic question here is whether the application introduced in evidence possesses the required quality of inconsistency.

The application involved here was not introduced in evidence for the purpose of showing knowledge upon the part of the railroad, whatever the condition of the crossing, with or without cars across it, the railroad admittedly had knowledge of the fact. Poe v. Chesapeake & O. Ry. Co., 64 F. Supp. 358. The application or any order based upon the application, were not relied upon as a pleaded basis of negligence or liability. Huckleberry v. Missouri P. R. Co., 324 Mo. 1025, 26 S. W. (2) 980; Anderson v. Kraft, (Mo. App.) 129 S. W. (2d) 85. The application was offered here as an evidentiary, probative fact in support of or because it tended to prove the ultimate charge of unusually or peculiarly dangerous crossing. White v. Hasburgh, (Mo. App.) 124 S. W. (2) 560. In the first place, it will be observed that

there is no explicit admission in the application that the crossing was "unusually" or "peculiarly" hazardous in the sense required for liability in this action. There are no facts set forth in the application demonstrating that the crossing· was unusually hazardous and the statement that it was "a dangerous grade crossing" is a mere conclusion made for the purpose of showing necessity of change and compliance with the Federal statute. Dimond v. Terminal R. Assn., 346 Mo., l. c. 352, 141 S. W. (2), l. c. 798. The admission contained in the application that the crossing was "dangerous" is not necessarily inconsistent with or contradictory of the railroad's claim that the crossing, occupied by an oil tank car, was not "peculiarly" or "unusually" hazardous within the meaning of the rule of law peculiarly applicable to this case. Any fair minded person would certainly concede that a railroad crossing over a paved, traveled highway is dangerous but that is a characteristic common to railroad crossings in general and the substantive rule of law involved here requires more than proof of what is general and common. This is not to say that applications of this kind are not competent and inadmissible in evidence in any case, but it is to say that in this case, where the essence of the cause of action is "unusually' or "peculiarly" hazardous crossing in the detailed circumstances, that the application is not such an admission as should have been received as evidence for the jury's consideration upon this essential issue. Kitchell v. C. & I. M. Ry. Co., 285 Ill. App. 368, 2 N. E. (2) 164; Stocker v. Boston & M. R. R. Co., 83 N. H. 401, 143 Atl. 68. The document was introduced in evidence through the Secretary of the Public Service Commission, it bore the stamp and dignity of official approval and was, no doubt, as impressive and forceful as intended and so prejudicial as not to be merely cumulative.

Upon the plaintiff's appeal as to the flagman, it is urged that the "Plaintiff's evidence showed defendant Wolfe was employed by the railroad to protect the public at the crossing, and although he saw the approaching automobile in which plaintiff was a passenger, he failed to give any warning and so was guilty of actionable negligence," and therefore the court erred in directing a verdict in his favor at the close of the plaintiff's evidence.

As to Wolfe, the petition set forth his employment and duty as a flagman, "of flagging with a lighted lantern or otherwise automobiles approaching and using said crossings and warning the drivers and occupants thereof of the approach of trains to said crossings and of danger from trains using said crossings." Specifically the petition pleaded that "on said occasion defendant Wolfe before said automobile reached said vicinity had flagged said Wabash crossing and the approach of said Wabash train, and thereafter negligently withdrew from said dark and unlighted crossing and said unlighted dark standing car thereon and walked toward said Santa Fe tracks and abandoned said Wabash crossing and the matter of the safety of persons

in automobiles approaching the same and negligently and in violation of his duties failed to warn or apprise those in said automobile of the presence of said dangerous and dark obstruction on said unlighted crossing, although he and defendant railroad had undertaken and assumed said duty and customarily [191] performed the same, * * *." The jury could reasonably find from the evidence of both the plaintiff and the defendant that the facts of the occurrence and of Wolfe's conduct were as set forth in the petition. The only difference in point of view is that Wolfe took the position that "We were to protect the public when a train was approaching." He said that it was his duty, in accordance with his employer's instructions, "To protect the crossing until it was blocked, until the train blocked the crossing, covered, in other words." It was his interpretation of his instructions, once a train occupied the crossing, that his duties were at an end and so, as the train entered upon the crossing, he started walking towards his shanty, three hundred and fifty feet away, and the automobile passed him as he approached the "flag stand." In these circumstances his instructions, particularly as interpreted by him, were not the whole measure of his duty to the public. It was indeed his duty "to protect the public when a train was approaching the crossing," and it would not be unreasonable for the jury to say, since he was aware of the Plymouth automobile's approaching the occupied crossing at a speed of twenty-five miles an hour, that he was also under a duty to the occupants of the automobile to again signal with his lighted lantern even though, under his instructions, he could walk away and leave the standing train unguarded. Burrichter v. C., M. & St. P. Ry. Co., 10 F. (2d) 165; 2 Restatement Agency, Secs. 350, 353, 354. Despite the distinctions between nonfeasance and misfeasance (Giles v. Moundridge Milling Co., 351 Mo. 568, 173 S. W. (2) 745, 751; McGinnis v. C., R. I. & P. Ry. Co., 200 Mo. 347, 98 S. W. 590) it could be found in the circumstances that Wolfe also owed a duty, apart from his duty to his employer under his instructions, to the plaintiff and that he was guilty of active, as distinguished from passive, negligence. Annotations 20 A. L. R. 97, 139; 99 A. L. R. 408; 57 C. J. S., Sec. 577; 74 C. J. S., Sec. 370. Compare Lakin v. C., R. I. & P. Ry. Co., 229 Mo. App. 461, 78 S. W. (2) 481. In the circumstances of this case the trial court erroneously directed a verdict for the flagman, Wolfe, at the close of the plaintiff's evidence.

The judgment against the Wabash Railroad Company is reversed and remanded and the judgment in favor of Wolfe is reversed and remanded. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.