**Motion for Rehearing Denied, Memorandum Opinion of January 10, 2012 Withdrawn, Reversed and Remanded and Substitute Memorandum Opinion filed April 24, 2012.**



**In The**

# Fourteenth Court of Appeals

_____

## NO. 14-11-00184-CV

_____

### BERNARD FELDMAN, Appellant

### V.

### RICHARD KIM, PULIN PANDYA, R. EMMETT MCDONALD, JUAN STERN, HOUSTON UROLOGY PARTNERS, P.A., 2724 YALE STREET PARTNERSHIP, L.P., AND 2724 MANAGEMENT COMPANY, L.L.C., Appellees

**On Appeal from the 129th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-46468**

## SUBSTITUTE MEMORANDUM OPINION

Appellees, Richard Kim, Pulin Pandya, R. Emmett McDonald, Juan Stern, Houston Urology Partners, P.A., 2724 Yale Street Partnership, LP, and 2724 Management Company L.L.C., filed a motion for rehearing. Their motion is denied; however, we withdraw our memorandum opinion of January 10, 2012, and the following substitute memorandum opinion is issued in its place.

In this shareholder oppression suit, appellant Bernard Feldman challenges the traditional summary judgment granted in favor of the defendants. Because we conclude that the defendants failed to meet their summary judgment burden, we reverse the judgment and remand the case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2004, Dr. Bernard Feldman learned of an opportunity to develop a medical office exclusively for the provision of medical services that were ancillary to his urology practice. Eventually, fellow urologists Richard Kim, Pulin Pandya, R. Emmett McDonald, and Juan Stern joined in the business venture and formed Houston Urology Partners, P.A. ("HUPPA"). Each doctor made a capital investment of approximately $280,000 in exchange for 1,000 shares of HUPPA. Feldman also had found a building for HUPPA to lease at 2724 Yale Street, so at the same time the doctors formed HUPPA, they also formed 2724 Yale Street Partnership, LP ("Yale Street") and 2724 Management Company L.L.C. ("the Management Company"). Yale Street purchased the building and leased it to HUPPA. Each physician owned 19.8% of Yale Street; the Management Company, which was the general partner in the limited partnership, owned the remaining 1%. Each doctor also owned 20% of the Management Company and of HUPPA. None of the five doctors who owned HUPPA actually worked for the company; they instead maintained their independent clinical practices and referred patients to HUPPA for ancillary services such as radiation, radiology, and pathology.

HUPPA quickly became profitable. Its bylaws provide that the board of directors, which consists of all five owners, has the discretion to declare dividends, but the doctors' Buy-Sell Agreement requires a two-thirds vote of the outstanding shares or of the board of directors before any dividend or distribution can be declared or paid. Its organizational documents do not specify how HUPPA's revenues and expenses are to be allocated among the owners, so the five doctors meet annually to decide allocation issues.

2

In 2005, the doctors decided to distribute HUPPA's earnings to the doctors with each receiving an equal share. In 2006 and 2007, HUPPA began allocating its revenues and expenses among the doctors in proportion to each doctor's "productivity," i.e., the extent of that doctor's patient referrals to HUPPA. Because Feldman's patient load was smaller, his proportionate payments from HUPPA were lower than those made to the other four doctors.

In early 2008, Feldman informed the other doctors that he planned to wind down his practice and retire. In response to this announcement, the other four doctors voted at a meeting of the board of directors to change HUPPA's accounting to allocate its expenses equally among all five owners so that each would be responsible for 20% of HUPPA's expenses.[1] They did not change the system of allocating revenues in proportion to productivity. As Feldman's retirement neared, his medical practice generated less than 20% of the referrals to HUPPA; thus, the 20% of HUPPA's expenses allocated to him exceeded his proportionate share of HUPPA's revenue. As a result, HUPPA began billing Feldman for his share of the operating expenses. Feldman is the only one of the doctors whose monthly allocation of revenue is a negative number. The other doctors also refused to repay $25,000 of a $50,000 loan that Feldman had made to HUPPA. They justified this action by asserting that they were offsetting the loan repayments against Feldman's share of HUPPA's expenses. Finally, Yale Street began withholding payment of Feldman's share of the building rent.

On May 30, 2008, Feldman wrote to the other doctors proposing to resign his position and retire from the practice of medicine, and asking them to buy his shares in HUPPA for $200,000. The other doctors generally agreed with Feldman's proposal, but

---

[1] This meeting was held on February 21, 2008, but Feldman did not attend. Faced with Feldman's protest of the vote occurring in his absence, a second meeting was held on April 7, 2008 with all five owners present. The vote was 4 – 1 to change the method of allocating expenses to an equal allocation among the five owners.

3

with one exception: they maintained that the purchase price was governed by the terms of the Buy-Sell Agreement. They therefore offered Feldman $70,000 for his shares. He rejected the offer and filed suit against the other four doctors, HUPPA, Yale Street, and the Management Company (collectively, "the defendants"), alleging that they had engaged in oppressive conduct designed to freeze him out of HUPPA and thereby defeat his legitimate and reasonable expectations for investing in it.

The defendants moved successfully for traditional summary judgment on Feldman's shareholder oppression claim, and Feldman timely appealed.[2]

## II. ISSUES PRESENTED

In three issues, Feldman challenges the trial court's grant of summary judgment. In his first issue, he contends that there is a genuine issue of material fact concerning the reasons for changing HUPPA's compensation scheme in 2008. In his second issue, Feldman argues that the trial court erred in concluding that, as a matter of law, HUPPA's actions did not constitute shareholder oppression. He asserts in his third issue that the trial court erred in ignoring the possibility that the majority shareholders' actions violated federal law.

## III. STANDARD OF REVIEW

We review the trial court's grant of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam) (citing *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.2d 184, 192 (Tex. 2007)). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *See Mack Trucks, Inc. v. Tamez,* 206

---

[2] The defendants had filed counterclaims for breach of contract and for declaratory judgment, but nonsuited these claims after they prevailed in their summary-judgment motion.

S.W.3d 572, 582 (Tex. 2006). We must affirm the summary judgment if any of the movant's theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A defendant who moves for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). On appeal, the summary-judgment movant still bears the burden of showing that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999).

## IV. ANALYSIS

Texas recognizes a cause of action for shareholder oppression. *See Ritchie v. Rupe*, 339 S.W.3d 275, 289 (Tex. App.—Dallas 2011, pet. filed) (stating Texas law authorizes a trial court to order a buyout of an oppressed minority shareholder as an equitable remedy for shareholder oppression); *Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex. App.—Tyler 2002, pet. denied); *Willis v. Donnelly*, 118 S.W.3d 10, 32 n.12 (Tex. App.—Houston [14th Dist.] 2003) (noting definition of "oppressive conduct"), *aff'd in part, rev'd in part on other grounds*, 199 S.W.3d 262 (Tex. 2006); *Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (recognizing the

5

existence of a shareholder-oppression cause of action); *Davis v. Sheerin*, 754 S.W.2d 375, 381 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (recognizing that the Texas Business Corporation Act provides a cause of action based on oppressive conduct). The doctrine of shareholder oppression protects the close corporation minority stockholder from the improper exercise of majority control. *Allen v. Devon Energy Holdings, L.L.C.*, No. 01-09-00643-CV, 2012 WL 880623, at *25 (Tex. App.—Houston [1st Dist.] March 9, 2012, no pet. h.).

> There are two non-exclusive definitions of shareholder oppression:
>
> (1) majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or
>
> (2) burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*Redmon*, 202 S.W.3d at 234 (quoting *Willis*, 997 S.W.2d at 801). "A claim of oppressive conduct can be independently supported by evidence of a variety of conduct." *Id.* (citing *Davis*, 754 S.W.2d at 381). "Because any one of a variety of activities or conduct can give rise to shareholder oppression, the fact that there may be a lack of evidence to support the existence of one such activity does not defeat the claim so long as there is evidence to support another such instance of conduct occurred." *Id.* at 234 n. 3. Therefore, to be entitled to summary judgment, the defendants in a shareholder oppression suit must conclusively prove that their conduct does not fall within either definition.

Oppressive conduct is an independent ground for relief that does not require a showing of fraud, illegality, mismanagement, wasting of assets, or deadlock. *Davis*, 754 S.W.2d at 381–82. In deciding whether conduct rises to the level of oppression, we exercise caution, balancing the minority shareholder's reasonable expectations against the corporation's need to exercise its business judgment and run its business efficiently;

however, we take a broad view of oppressive conduct to a shareholder in a closely held corporation, where oppression may more easily be found. *Redmon*, 202 S.W.3d at 234; *Willis*, 997 S.W.2d at 801; *Davis*, 754 S.W.2d at 381.

Liability for shareholder oppression may occur when controlling shareholders squeeze-out a minority shareholder from the business returns but continue to share in the corporate earnings themselves. *Allen*, 2012 WL 880623, at *25; *Redmon*, 202 S.W.3d at 235.

While disputed in part, Feldman presented the following summary judgment evidence:

- Doctors Kim, Pandya, McDonald, and Stern became dissatisfied with the way in which HUPPA's revenues and expenses were allocated because they believed that Feldman had been overcompensated in the past.

- Their dissatisfaction grew stronger when Feldman announced his plan to retire.

- They then voted to change the allocation method to use one set of criteria when allocating expenses, but different criteria when allocating revenue.

- Feldman's associates took this action knowing that it would increase their returns at Feldman's expense—literally.

- Although HUPPA was economically profitable in 2008, Feldman's associates caused HUPPA to refuse to repay half of the funds it had borrowed from Feldman.

- Feldman's associates also caused Yale Street to stop paying him his share of the rent on the building it leased to HUPPA.

When this evidence is viewed in the light most favorable to Feldman, it cannot be said that, as a matter of law, the defendants' conduct falls outside the definition of shareholder oppression. We therefore conclude that the defendants failed to meet their summary judgment burden. *See Redmon*, 202 S.W.3d at 236.

The defendants' arguments to the contrary are not persuasive. They contend that their actions were not oppressive because they voted to apportion expenses equally among

7

the owners. This method, however, is—and was designed to be—inconsistent with the method for allocating revenue, placing Feldman in the position of subsidizing returns for his associates while receiving none himself. This fact, even if taken alone, is sufficient to defeat summary judgment. *See id.* at 235–36.

The defendants also argue that HUPPA was not intended to be a passive investment vehicle, but instead was founded on the assumption that its owners would continue actively practicing medicine. There is summary judgment evidence to raise a fact issue on this assumption. HUPPA is in the business of delivering medical services that are ancillary to its owners' medical practices and that none of its owners perform. Moreover, HUPPA's organizational documents require only that an owner be a licensed physician, and the defendants cite no evidence or authority that a person who retires from the active practice of medicine ceases to be a licensed physician.[3]

The defendant physicians additionally contend that they changed HUPPA's allocation methods "in response to a perceived unfairness" in that they believed that Feldman had been overcompensated in the past. They maintain that the question of whether the various allocation methods that HUPPA has used actually are unfair "is a matter of business judgment for the members to decide through their voting." In effect, they assert that "fairness is in the eye of the beholder," and is to be determined from the point of view of the very individuals whose conduct is alleged to be unfair. We disagree. "Shareholder oppression" is defined in objective terms rather than by the perception of the majority that are claimed to benefit from the alleged oppression. *See Willis*, 997 S.W.2d at 801.

---

[3] HUPPA's Articles of Association provide, "Each of the original members of the association is licensed to perform the type of professional service for which the association is formed." Under its bylaws, "Only natural persons who are duly licensed to practice medicine in the State of Texas and no other person or party shall be qualified to be a member . . . of the Association and to hold shares representing ownership interests therein." Finally, the Buy-Sell Agreement between the owners does not list retirement from the active practice of medicine as an event that gives HUPPA or the other owners the preemptive right to force the sale of the retiring owner's shares.

8

Finally, each of the defendants' arguments fails to account for a critical and undisputed fact: Feldman's associates did not merely change HUPPA's expense-allocation method; they also caused HUPPA to stop repaying funds borrowed from Feldman, and caused Yale Street and the Management Company to stop paying Feldman his share of the rent—even though these are separate transactions from the allocation of HUPPA's revenue and expenses.

Viewing the evidence favorably to Feldman as the summary judgment respondent, we hold that the defendants failed to prove as a matter of law that they did not commit shareholder oppression. We therefore sustain Feldman's second issue.

## V. CONCLUSION

Because the defendants failed to meet their summary judgment burden to establish, as a matter of law, that their conduct did not fall within either definition of shareholder oppression, we reverse the trial court's summary judgment and remand the case without addressing the remaining issues. *See* TEX. R. APP. P. 47.1.


/s/     Tracy Christopher
Justice


Panel consists of Chief Justice Hedges, Justice Christopher, and the Honorable Robert Schaffer, Judge of the 152nd District Court of Harris County, sitting by assignment pursuant to section 74.003(h) of the Government Code. *See* TEX. GOV'T CODE ANN. § 74.003(h) (West 2005).

9