Gerald D. ALLINSON, a minor, by his next friend, Roy Allinson, Plaintiff-Respondent,

v.

MISSOURI-KANSAS-TEXAS RAILROAD COMPANY, a corporation, Defendant-Appellant.

No. 7880.

Springfield Court of Appeals.

Missouri.

June 19, 1961.

Poague & Brock, Julius Wall, Clinton, for defendant-appellant.

John M. Belisle, Morran D. Harris, Osceola, for plaintiff-respondent.

STONE, Presiding Judge.

About 6:30 P.M. on Saturday, December 20, 1958, plaintiff Gerald D. Allinson, then sixteen years and three months of age, and a neighbor youth, Rondole Lee Lewellen, who had just turned his sixteenth birthday, left their farm homes southeast of Appleton City, Missouri, in a 1952 Chevrolet sedan owned by plaintiff's father. With plaintiff driving, they headed for Rockville where they had "dates" at 7 P.M. But, this youthful pleasure trip quickly turned into a nightmare of disappointment and disaster when, on farm-to-market Route P, a two-lane highway with a blacktop surface, the Chevrolet crashed into the side of a Katy freight train standing on a country crossing, sometimes called the Lindale crossing. For injuries then sustained, plaintiff brought this suit against defendant railroad and in due time obtained a verdict and judgment for $3,500. On this appeal, defendant's initial contention is that its motion for a directed verdict at the close of the evidence should have been sustained because (a) plaintiff failed to make a submissible case of actionable negligence on the part of defendant and (b) plaintiff was guilty of contributory negligence as a matter of law.

At the Lindale crossing, Route P is an east-and-west road intersected by two sets of defendant's tracks, about 39 feet apart, running in a general northerly-and-southerly direction. The east set of tracks is a switch track or siding, and the west set is the main line track. For a west-bound motorist approaching the Lindale crossing from the east, as was plaintiff on the occasion under discussion, Route P is straight for almost one mile; and, for some 500 feet east of the crossing, the highway is practically level. From the railroad crossing sign erected by the State Highway Department on the north shoulder of Route P about 450 feet east of the crossing to the main line crossing, defendant's surveyor found a difference in elevation of only .59 foot (or about 7 inches), the investigating trooper of the State Highway Patrol agreed that "to the naked eye it's practically level," and plaintiff himself estimated only an inconsequential upgrade (for a west-bound motorist) of "I'd say a couple feet" which, as he readily conceded, did not tilt the headlights of the west-bound Chevrolet enough to interfere with his vision ahead or to cast the headlight beams away from an object on the crossing. In the first 100 feet west of the main line crossing, there is (looking west) a sloping downgrade, but not an abrupt drop, of 2.67 feet.

At the time of accident, the main line crossing was blocked by one car of a north-bound 156-car freight train, which had stopped with about 27 cars south of the crossing and had been cut near the head

or north end of the train for switching operations. Plaintiff described the car on the crossing as "a dark object"—"either a coal car or a box car." His companion "thought it was a box car"—"some kind of dark color"—"it could have been black or brown or something, I don't know for sure." Plaintiff's witness Brown, east-bound on Route P who approached the crossing from the other side and "just came to a normal stop" some 20 to 30 feet from the standing train, said that the crossing was blocked by a red box car. In any event, the blocking car was *not* a flat car. Contrast Carson v. Baldwin, 346 Mo. 984, 144 S.W.2d 134. Admittedly, there was no light on the train near the crossing and no flagman at the crossing. In fact, none of the train crew saw the collision or even knew of it until the station operator at Appleton City informed them by radio while the train was running near LaDue, Missouri.

Plaintiff's testimony affirmatively showed that there was no fog, mist or other atmospheric condition which limited or affected his vision on the evening of this accident. In short, it was "a normal night" for driving. The Chevrolet sedan driven by plaintiff had four-wheel brakes "in good working condition" and headlights "working properly" on both high and low beam which, at and immediately prior to the accident, were on high beam. Young Lewellen, his companion at the time and his witness upon trial, confirmed the fact that the Chevrolet had "good headlights"— "they was regular, they was in good condition," and that, approaching the crossing, the headlight beams were not tilted up or down by the topography of the highway and he had "normal view" ahead. Plaintiff had traveled this same road "many times before," both during the day and at night and both west-bound and east-bound. As he neared the crossing, he knew that he was approaching it, knew that there were two sets of tracks, and knew "the lay of the land on the west side of the tracks." Proceeding west on Route P, plaintiff had been driving the Chevrolet (so he stated at the trial) at a speed of about 45 miles per hour; but, realizing his approach to the crossing, he had slackened speed to 30–35 miles per hour before he reached the first set of tracks, i. e., the switch track or siding. This slackening of speed must have been accomplished simply by lifting his foot on the accelerator, because plaintiff insisted that he did not have time to get his foot on the brake pedal after he first sighted "a dark object" on the main line crossing as the Chevrolet was passing over the switch track or siding, no more than 39 feet distant. Plaintiff did not see the obstruction on the main line crossing a sufficient length of time prior to the crash to recognize it or to know that he was about to run into the side of a train. Young Lewellen "saw it just a split second before we hit it * * * just about the same time we hit it, really" but, in that split second, thought that it was a train. Plaintiff said that he had been looking "straight ahead," and his companion said that, although he had been "just talking mostly," he also had been "looking down the road."

The only reason suggested by plaintiff upon trial, or by his counsel upon appeal, for plaintiff's failure to have observed the train in time to have stopped safely was that, while he was traveling "the last thousand or twelve hundred feet" before reaching the crossing, plaintiff and his companion saw what appeared to be the headlights of an east-bound automobile on the other side of the crossing, and that thereby (in the language of his brief) "plaintiff was given the impression (mistaken though it was) that the way was clear; that is, an *illusion of safety was created wherein* plaintiff was deceived as to the actual situation." There was evidence that, due to the downgrade (looking west) of 2.67 feet in the first 100 feet west of the crossing, the headlights of an automobile, headed east up that grade, would shine under a freight car standing on the main line crossing and would be visible to a west-bound motorist (such as plaintiff) on the opposite

side of the crossing. Plaintiff testified that he saw "two lights almost together"—"you could barely see both of them there." When he first saw these lights, plaintiff had no idea how far they were from the crossing. He thought that they were moving at first, but he could not say whether they continued to move until the moment of collision. The testimony of young Lewellen, plaintiff's companion, concerning these lights was to the effect that, when he first saw them, they looked "like any normal car lights" and "might have been about the same or a little closer" to the crossing than the Chevrolet driven by plaintiff. "It seems to me (Lewellen) like they were moving, but they might have been not very much." Lewellen thought that these lights remained visible to him until the time of accident. As to whether they had stopped moving, "they might have just a little while before it got to the tracks." Both plaintiff and his companion testified positively that these lights in no wise blinded them or interfered with their vision ahead.

Evidence adduced by *plaintiff* showed that, while the crossing was blocked, at least three east-bound automobiles approached from the west on Route P and stopped safely. The driver of one of those automobiles, *plaintiff's* witness Reasoner, approached the crossing under circumstances somewhat analogous to those surrounding plaintiff's approach, in that, as Reasoner neared the crossing, he saw "lights * shining underneath" the train from the headlights of an automobile (not the Chevrolet driven by plaintiff) on the opposite side of the crossing, headed west on Route P. He "couldn't see right exactly into" these headlights but the "lights * shining underneath" the train helped, rather than hindered, him in discovering the obstruction—"that's how come I noticed the train." Reasoner, who had been traveling 55 to 60 miles per hour, made "a pretty fair stop" without skidding his wheels or sliding sidewise. Both he and the motorist on the opposite side of the crossing turned around and left before

plaintiff drove into the train. Another of the east-bound drivers, identified as Raymond Diehl, also had turned around and had left before plaintiff's accident. The third east-bound driver, *plaintiff's* witness Brown, who had approached the crossing at 40 miles per hour, had "not too much" trouble seeing the train and "just came to a normal stop" some 20 to 30 feet from the crossing. After waiting for several minutes, Brown backed a short distance to the west on Route P and then, in the process of turning around, pulled forward to his left or to the north into a country road paralleling the railroad tracks and stopped with the rear end of his automobile about five feet from Route P and with the headlights pointed to the north up this country road. According to Brown, his automobile was in this position when plaintiff collided with the train, although he had seen "under the train" the lights of an approaching westbound automobile (presumably the Chevrolet driven by plaintiff) as he was backing on Route P, before pulling forward into the country road.

█ It is settled law in this jurisdiction that ordinarily the presence of a train upon a public road crossing constitutes adequate notice to travelers that the crossing has been preempted [Albertson v. Wabash R. Co., 363 Mo. 696, 701, 253 S.W.2d 184, 187 (1)]; that a railroad is not guilty of negligence in blocking such crossing without providing additional warnings or signals, unless special circumstances make the crossing peculiarly hazardous [State ex rel. Thompson v. Cave, 358 Mo. 414, 417–418, 215 S.W.2d 435, 436(1); Dimond v. Terminal R. R. Ass'n of St. Louis, 346 Mo. 333, 347(2), 141 S.W.2d 789, 795, 7 NCCA(NS) 174]; and, that the burden of showing such special circumstances rests upon plaintiff. Zickefoose v. Thompson, 347 Mo. 579, 590, 148 S.W.2d 784, 790(6); Hicks v. Chicago, M., St. P. & P. R. Co., Mo.App., 233 S.W. 2d 787, 789(1). Returning to the facts of the instant case, it is clear that the Lindale crossing was not made "peculiarly hazard-

ous" by reason of the blacktop roadway on Route P, a dark-colored car on the crossing, and the relatively insignificant variations in ground level along Route P *east* of the crossing. See State ex rel. Thompson v. Cave, supra, and cases there cited. So, *if* the Lindale crossing became "peculiarly hazardous," it must have been by reason of the topography *west* of the crossing which (so plaintiff's evidence showed) made the headlights of east-bound vehicles on Route P, approaching the crossing from the west, visible to west-bound travelers (such as plaintiff) on the opposite side of the crossing. And, in the final analysis, that is the only circumstance which conceivably could supply any substance or body to plaintiff's claim that (in the language of his counsel) he "was given the impression (mistaken though it was) that the way was clear; that is, an illusion of safety was created wherein plaintiff was deceived as to the actual situation."

In the Albertson case, supra, 363 Mo. loc. cit. 702, 253 S.W.2d loc. cit. 188 (upon which instant plaintiff primarily relies), the broad statement of the test of liability in cases of this character, i. e., "whether, all the circumstances considered, an illusion of safety is created," is followed immediately by the definitive, explanatory and limiting comment that "*(i)f the motorist is exercising the requisite care for his own safety but the particular circumstances nevertheless create an illusion of safety,* it is for the jury to say whether the obstructed crossing is unusually hazardous * * *." (All emphasis herein is ours.) That a motorist says that he did not or could not see a car on a crossing and that he crashed with undiminished speed into the side of the car are not "special circumstances" demonstrating that the crossing is "peculiarly hazardous," for, to be "peculiarly hazardous" in legal contemplation, the crossing must be such "that a motorist *even though exercising due care for his own safety* may nevertheless collide with the standing car." Albertson v. Wabash R. Co., supra, 363 Mo. loc. cit. 701, 253 S.W.2d loc. cit. 187(3).

And, see Dimond v. Terminal R. R. Ass'n of St. Louis, supra, 346 Mo. loc. cit. 348, 349, 141 S.W.2d loc. cit. 796(2), 797; Rowe v. Henwood, Mo.App., 207 S.W.2d 829, 833(2).

Instant plaintiff, as the driver of a motor vehicle on the public highways of this state, was under the statutory duty to exercise the highest degree of care for his own safety [V.A.M.S. § 304.010] and, knowing that he was approaching the Lindale crossing with which he admittedly was altogether familiar, was enjoined to take all reasonable precautions for his own safety. Rowe v. Henwood, supra, 207 S.W.2d loc. cit. 833(5). See also Reedy v. Missouri-Kansas-Texas R. Co., Mo., 347 S.W.2d 111; Pipes v. Missouri Pacific R. Co., Mo., 338 S.W.2d 30, 35(5); Short v. Missouri-Kansas-Texas R. Co., Mo., 312 S.W.2d 50, 54 (2); Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 229, 248, 172 S.W.2d 835, 848. On a clear night with no abnormal atmospheric condition limiting his vision, he was driving a Chevrolet automobile with good four-wheel brakes and good headlights on high beam; and, in view of the previously-detailed testimony of both plaintiff and his companion concerning the headlights, we may not assume that they were below the legal requirement imposed by V.A.M.S. § 304.350, to-wit, "an uppermost distribution of light, or composite beam, so aimed and of such intensity as to reveal persons and vehicles at a distance of at least three hundred and fifty feet ahead for all conditions of loading." Leek v. Dillard, Mo.App., 304 S.W.2d 60, 68. See also Peterson v. Tiona, Mo., 292 S.W.2d 581, 583; Lemken v. Brooks Truck Lines, Inc., Mo., 322 S.W.2d 803, 805–806; Noland v. Pastor, 8 Cir., 191 F.2d 1009, 1012–1013. Although it is claimed that the headlights of an east-bound automobile on the opposite side of the Lindale crossing created "an illusion of safety," we may say with assurance (because plaintiff so stated unequivocally) that those headlights did *not* blind plaintiff or interfere with his vision ahead.

In the oft-cited case of Mabray v. Union Pac. R. Co., D.C.Col., 5 F.Supp. 397, 398, plaintiff motorist, at a railroad crossing over a main highway in Denver, on a dark, snowy night ran into the side of a stock train "with cars so constructed that lights from the opposite side of the train would be easily visible to travelers on the other side thereof." In holding that plaintiff's complaint did not "set up a condition which (imputed) primary negligence to the defendant," the court quoted extensively from 52 C.J., Railroads, § 1782, p. 190 [see 74 C.J.S., Railroads, § 720, loc. cit. 1324], including the statement that "the railroad company is not chargeable with negligence for failure to give a warning where conditions are not such that the employees in charge of the train, in the exercise of reasonable care, should anticipate that because of the darkness persons traveling along the highway in vehicles *properly equipped with lights and operated with due care* would be likely to come into collision with the obstruction." 5 F.Supp. loc. cit. 400.

In Lowden v. Bowles, 188 Okl. 35, 105 P.2d 1061, 1063, where the Mabray case, supra, was followed, the factual situation was closely analogous to that here presented in that the occupants of the east-bound automobile (in which plaintiffs' deceased daughter had been riding as a passenger) saw the headlights of west-bound automobiles on the other side of the obstructed crossing "between the bottom of the freight car and the tracks (because of the difference in the levels of the street and railway tracks) and believed the (west-bound) automobiles were actually moving toward their automobile, * * * and therefore did not see the particular freight car nor the standing train." Plaintiffs asserted "that this constituted a deceptive condition and led up to the collision." In holding that, as a matter of law, plaintiffs' evidence was insufficient to justify submission of the issue of defendants' primary negligence, the Supreme Court of Oklahoma wrote, "We do not think the elevation of the tracks above the sur-

rounding levels nor the relation of the lights of the automobiles on the opposite sides of the standing train, even if deceptive to the driver and occupants of this automobile, are sufficient as a matter of law to cast upon the employees of the defendants, exercising reasonable care, the duty to anticipate that the traveling public would be deceived, and led to collide with the standing train. * * * It seems to us that if the employees of the defendants must take such things as this into consideration, there is no possible arrangement that could be made at crossings that would relieve them of the duty of warning the traveling public in all instances."

■ Considering all of the circumstances in the case at bar (as plaintiff's counsel admonish us to do), we are of the opinion that the evidence was insufficient to make a submissible case on the issue of defendant's negligence. In this connection, see Dimond v. Terminal R. R. Ass'n of St. Louis, supra, 346 Mo. loc. cit. 350–351(5), 141 S.W. 2d. loc. cit. 797(8), where our Supreme Court, in reversing a judgment for plaintiff (a passenger in the automobile), held that the case was not submissible on plaintiff's theory that lights on the other side of the crossing "created the impression of a clear highway and made a 'danger trap' for travelers." Consult also Raley v. Thompson, 203 Okl. 633, 225 P.2d 171.

If we entertained any doubt as to the propriety of our holding that a submissible case was not made on the issue of defendant's negligence, we nevertheless would be constrained to reach the same result on the ground that plaintiff was guilty of contributory negligence as a matter of law. In Rowe v. Henwood, supra, plaintiff, driving 30 miles per hour at night with heavy snow falling, ran into coal cars standing on a railroad crossing with which he was familiar. Following much the same pattern as instant plaintiff, Rowe said "that he was confused by light down the highway ahead of him which he mistook to be the light of another automobile * * * and *which gave him*

**908**

*the impression that the road was open,"* when, in fact, he saw the light through the broad coupling space between two coal cars. 207 S.W.2d loc. cit. 832. Plaintiff Rowe also testified that strong lights at a nearby airfield had a tendency to make " 'a blind spot * * * at the crossing' " and that "on all previous occasions when he had observed a train about to cross or actually crossing the highway, there was 'always someone there to stop traffic.' " 207 S.W. 2d loc. cit. 832. With Rowe thus in a position less vulnerable to a charge of contributory negligence than is instant plaintiff, the court pointed out that Rowe, familiar with the crossing, was bound to have anticipated that a train might be standing upon or moving over the crossing at any time and was required to take such precautions as were commensurate with proper discharge of his obligation to exercise the highest degree of care, emphasized that another driver approaching the same crossing under similar conditions stopped safely, and declared Rowe to have been guilty of contributory negligence as a matter of law.

In determining whether instant plaintiff was contributorily negligent as a matter of law, the basic inquiry is whether, all of the surrounding circumstances considered, there was any substantial evidence excusing his admitted failure to have seen the train if he had looked. State ex rel. Kansas City Southern Ry. Co. v. Shain, 340 Mo. 1195, 1203, 105 S.W.2d 915, 919; Rowe v. Henwood, supra, 207 S.W.2d loc. cit. 833. Without repeating the facts hereinbefore detailed, suffice it to say that we are convinced that plaintiff's own evidence convicts him of contributory negligence as a matter of law. Rowe v. Henwood, supra; Mabray v. Union Pac. R. Co., supra, 5 F. Supp. loc. cit. 400–403. See also Zickefoose v. Thompson, supra, 347 Mo. loc. cit. 590–591(5), 148 S.W.2d loc. cit. 790(6); Turner v. Illinois Central R. Co., Mo., 319 S.W.2d 539; Tidwell v. Atlanta, B. & C. R. R., 42 Ga.App. 744, 157 S.E. 535. On this point, defendant cites Fitzpatrick v. Kansas City Southern Ry. Co., 347 Mo. 57,

146 S.W.2d 560, Poehler v. Lonsdale, 235 Mo.App. 202, 129 S.W.2d 59, and Elliott v. Missouri Pac. R. Co., 227 Mo.App. 225, 52 S.W.2d 448. In the Fitzpatrick case, plaintiff was held guilty of contributory negligence as a matter of law; but, the facts in each of the three cases were so grossly dissimilar to those under review that the cited cases are not controlling or persuasive here.

The judgment for plaintiff is reversed.

McDOWELL and RUARK, JJ., concur.