Jackie Jo HENDRICKS, pro ami.,
Plaintiff (Respondent and
Cross-Appellant),

and

Dixie Lee Hendricks, Intervenor
(Respondent),

v.

MISSOURI–KANSAS–TEXAS RAIL-
ROAD COMPANY, Defendant
(Appellant and Cross-Respondent).

Nos. 13974, 13986.

Missouri Court of Appeals,
Southern District,
Division Two.

March 31, 1986.

Howard C. Gosnell, Jr., Chris Hoberock, Ewing, Carter, McBeth, Smith, Gosnell, Vickers & Hoberock, Nevada, for defendant (appellant and cross-respondent) Missouri-Kansas-Texas R. Co.

J. Michael Cronan, Cronan, Messick & Gordon, Kansas City, for plaintiff (respondent and cross-appellant) Jackie Jo Hendricks.

CROW, Judge.

About 3:55 p.m., Saturday, December 20, 1980, Jackie Leroy Hendricks ("Jack"), age 36, was driving his 1972 Ford Torino, unaccompanied, westbound on an unpaved county road in Vernon County, some 3 to 3½ miles east of Nevada. Ahead of Jack's Torino, the road intersected a railroad track at a "grade crossing." The track, owned by Missouri-Kansas-Texas Railroad Company ("M-K-T"), ran generally from southwest to northeast, and crossed the road obliquely, so that the angle created where the east rail of the track met the south edge of the road was approximately 135 degrees, while the angle formed by the east rail and the north edge of the road was approximately 45 degrees. This is illustrated by the aerial photograph (Defendant's Exhibit K–1) appended hereto. The building in the photograph lies east of the track in the acute angle formed by the east rail and the north side of the road. The curving highway in the photograph, paralleling the track as it proceeds southwest, is U.S. Highway 54.

Jack, driving west, entered the crossing, at which time his Torino was struck on the driver's side by an M-K-T locomotive. The locomotive, heading northeasterly, was pulling an M-K-T train consisting of four loaded freight cars, five empty freight cars, and a caboose.

The locomotive proceeded 504 feet past the point of impact, pushing the Torino down the track that entire distance, before stopping. Ronald Clyde Rude, a brakeman on the train, was the first person to reach Jack's Torino after it came to rest. Rude observed that Jack was dead.

Jack was survived by one child, Jackie Jo Hendricks ("Jackie Jo"), born August 11, 1976, and by his wife, Dixie Lee Hendricks ("Dixie"), whom Jack had married April 17, 1979.

On December 24, 1981, Jackie Jo, by her next friend (her mother, Joanne Leona Hendricks, whose marriage to Jack had been dissolved in May, 1978), filed a "petition for wrongful death" against M-K-T in the Circuit Court of Vernon County.

On February 5, 1982, Dixie was granted leave to intervene in the action, and she filed a petition of her own seeking damages for Jack's death.

Venue was changed to Barton County, and on June 22, 1984, a four-day trial ended with a jury verdict assessing fault for Jack's death at 40 per cent against M-K-T and 60 per cent against Jack. The jury determined the aggregate damages sustained by Jackie Jo and Dixie as a result of Jack's death to be $500,000. The trial court afterward reduced the damages by 60 per cent—the percentage of fault attributed to Jack—and entered judgment against M-K-T for $200,000, which the trial court apportioned equally between Jackie Jo and Dixie.

At trial, liability was asserted by Jackie Jo and Dixie (hereafter referred to collectively as "plaintiffs") against M–K–T on the theory that the grade crossing was unusually dangerous, and that M–K–T's locomotive engineer, W.M. Journot, operated the train in a negligent manner.[1]

M–K–T appeals, briefing six assignments of error, discussed *infra*. Jackie Jo cross-appeals, maintaining that the trial court erred in dismissing a count of her petition which undertook to plead a cause of action against M–K–T on the theory of "strict liability in tort."

We deal first with M–K–T's appeal, number 13974. M–K–T's first assignment of error is that the trial court wrongly allowed Michael Paul Massie to testify, over M–K–T's objection, that the grade crossing was "unusually hazardous," in that such testimony "constituted an opinion and legal conclusion of said witness and the opinion and conclusion given by said witness invaded the province of the jury and was not the proper subject of either lay or expert testimony and for the further reason that witness Massie was not competent to render such an opinion." This assignment of error is intertwined with M–K–T's second assignment of error, which asserts that the trial court erred in giving Instruction No. 6[2] "for the reason that there was no substantial evidence properly admitted at the trial which would support a jury finding that the crossing was 'unusually dangerous.'"

Massie, characterizing himself as an "[i]nvestigative consultant as to train handling and operation, and railroad/highway grade crossing accidents," revealed that he was retained by Jackie Jo's attorney November 11, 1982, to investigate the collision. Massie's credentials included "[s]ix years college in design and architecture," and employment from 1967 through 1978 by a railroad (not M–K–T), during which he worked seven years as a switchman and brakeman, and four years as a licensed locomotive engineer. In the latter capacity, Massie operated trains in southeast Missouri and southern Illinois, in both urban and rural areas, and was responsible for training new engineers. On cross-examination, Massie disclosed that during his railroad employment he was "involved in two fatal accidents," and that as a result of the second one the railroad terminated his employment.

Massie visited the collision site on one occasion, June 24, 1983, making photographs while there. At trial, Massie was asked to assume that the train was placed in "emergency brake application" four car lengths southwest of the crossing[3] and that the train stopped 504 feet northeast of the point of impact. Utilizing those assumptions, among others, and applying a formula for calculating train stopping distances,

---

1. Instruction No. 6, given at the request of plaintiffs, reads:

   "Your finding must be that the defendant has fault and you must assess a percentage of fault to the defendant if you believe:
   First, plaintiff Jackie Jo Hendricks is the daughter of Jackie Jo Hendricks and plaintiff Dixie Lee Hendricks is the widow of Jackie LeRoy Hendricks, and
   Second, the crossing mentioned in the evidence at the time of the death of Jackie Leroy Hendricks was unusually dangerous, and
   Third, either:
   W.M. Journot operated the train at an excessive speed, or
   W.M. Journot knew or by the use of ordinary care could have known that there was a reasonable likelihood of collision in time thereafter to have slackened the train speed or stopped the train, and

   Fourth, W.M. Journot in any one or more of the respects submitted in paragraph Third was thereby negligent, and
   Fifth, such negligence directly caused or directly contributed to cause the death of Jackie Leroy Hendricks.
   The term 'negligent' or 'negligence' as used in this instruction means the failure to use ordinary care. The phrase 'ordinary care' means that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

2. Footnote 1, *supra*.

3. A report by brakeman Rude to M–K–T's division superintendent stated that the train was placed in "emergency" about four car lengths before impact. Engineer Journot testified that the length of a railroad car is generally around 50 feet.

Massie opined that the train was going 31 miles per hour "at the time the emergency application was made." Massie also testified that he had reviewed the "speed tape" from M–K–T's locomotive, and that the tape confirmed that the speed of the locomotive at the point of emergency application was 31 miles per hour.

Although engineer Journot testified that the train was going only about 25 miles per hour when he placed it in emergency, M–K–T does not, on appeal, challenge the admissibility of Massie's opinion that the speed was 31. Indeed, an expert for M–K–T, utilizing the speed tape and the results of tests performed on the locomotive's speed recorder after the accident, concluded that the train was going 28.6 miles per hour when it was placed in emergency. The expert revealed, however, that the speedometer at which engineer Journot would have been looking would have indicated a speed of only 25.17 miles per hour.

While the dispute as to speed does not appear significant, it becomes so when we consider M–K–T's contention (point 2) that the evidence was insufficient to support submission to the jury of the issue whether the grade crossing was unusually dangerous.

*Jenkins v. Wabash Railroad Co.,* 322 S.W.2d 788, 793 (Mo.1959), explains that in the country, between stations away from congested populations, it is not negligence for trains to run at rapid speeds over road crossings. However, says *Jenkins,* whether negligent speed exists depends upon all the surrounding circumstances, and it has been stated that although warning signals are given, where a railroad crossing is dangerous, the railroad company also owes the additional duty to such travelers to pass such crossing at a reasonable rate of speed, proportioned to the danger.

*Jenkins,* like the instant case, arose from a fatal collision between an automobile and a locomotive at a crossing. *Jenkins* concluded it was material to determine whether the evidence there was sufficient to authorize a finding by the jury that the crossing was "dangerous" within the meaning ascribed to that term in relation to the operation of trains thereover at a negligent speed, and if so, whether the speed at which the train there was operated (75 to 78 miles per hour) was, under all circumstances, excessive so as to constitute actionable negligence. *Id.*

The opinion in *Jenkins* noted that while the crossing was not located in a town, it did lie in a "substantially populated rural area," and was "extensively used by the traveling public." Additionally, the road did not approach the crossing at a right angle to the track, with an unobstructed view. Instead, the view of a motorist approaching the crossing from the north (as did the automobile involved in the accident) was totally obstructed until the motorist was very near the track. Under those circumstances, *Jenkins* held it was for the jury to determine (a) whether the crossing was dangerous, as that term was used in determining whether the railroad owed a duty to travelers on the highway to pass over the crossing at a reasonable rate of speed, (b) whether, under the circumstances, it was negligence to operate the train at 75 to 78 miles per hour, and (c) if so, whether such negligence was the proximate cause of the fatalities. *Id.*

*Branson v. Atchison, T. & S.F. Ry. Co.,* 239 S.W.2d 1003, 1004[1, 2] (Mo.App.1951), states that in the country between stations away from congested areas, it is not negligence for passenger trains to run at a rapid speed over railroad crossings, and, at such a crossing, it is a question of what is a reasonable rate of speed under the circumstances, and this in turn rests upon the question of whether the crossing is unusually dangerous or hazardous, and whether a crossing is more than ordinarily hazardous or dangerous depends upon the circumstances surrounding it. In *Branson,* the crossing was on a county road three miles from town, and the train was going 75 miles per hour between 3:00 and 4:00 a.m., when the engineer saw a flickering light ahead. The engineer applied the brakes, and then saw an object on the track 400 to 500 feet ahead. The flickering light

turned out to be a flashlight by which a motorist was attempting to warn the train that the motorist's vehicle was stuck on the track. The train was going 40 to 45 miles per hour when it struck the automobile. A jury verdict in favor of the motorist for damage to the automobile was set aside by the trial court on the ground that there was no substantial evidence that the crossing was unusually dangerous. On appeal, the trial court's action was upheld.

■ It is evident from *Jenkins* and *Branson* that under Missouri law, driving a train at a particular speed through a crossing in a rural area could be found negligent if the crossing were unusually dangerous, while driving a train at the same speed through a rural crossing that presents no unusual danger could be found non-negligent.

■ The fact that plaintiffs here chose to include in their verdict-directing instruction[4] a hypothesis that the crossing was unusually dangerous demonstrates that plaintiffs were mindful of the importance of the distinction between an unusually dangerous crossing and one not so hazardous. Because the evidence most favorable to plaintiffs regarding the speed of M–K–T's train was that it was going only 31 miles per hour when engineer Journot applied the brakes, the obvious inference is that plaintiffs felt their chance of recovery would be enhanced if they could avail themselves of, in their words, the "unusually dangerous crossing doctrine." Bearing in mind that Jack, as a motorist, was required to exercise the highest degree of care,[5] § 304.010.1, RSMo Cum.Supp.1980; *Ficken v. Hopkins*, 389 S.W.2d 193, 195[2] (Mo. 1965), while M–K–T, in operating its train, was required to exercise only ordinary care, *Cunningham v. Thompson*, 277 S.W.2d 602, 609[7] (Mo.1955); *Hackett v. Wabash Railroad Co.*, 271 S.W.2d 573,

577[1] (Mo.1954), plaintiffs' strategy is understandable.

The record reveals that the locomotive that struck Jack's Torino was assigned the mission of switching cars for M–K–T's trains at all towns between Parsons, Kansas, and Clinton, Missouri. Described as a "local," and nicknamed the "Clinton Switcher," the locomotive operated six days per week, going from Clinton to Parsons on Mondays, Wednesdays, and Fridays, and from Parsons to Clinton on Tuesdays, Thursdays, and Saturdays. Engineer Journot explained, "We do the local work which means we, if we have cars for a certain town or an elevator, we set the cars in and pick up the loads or whatever needs to be done."

Before reviewing any more of the evidence, it is helpful to note certain rules of law pertinent to M–K–T's second point. In *Reames v. St. Louis-San Francisco Railway Co.*, 359 S.W.2d 230 (Mo.App.1962), and *Allinson v. Missouri-Kansas-Texas Railroad Co.*, 347 S.W.2d 902 (Mo.App. 1961), motorists drove their vehicles into motionless trains at crossings. The opinion in each case stated that ordinarily the presence of a train upon a public road crossing constitutes adequate notice to travelers that the crossing has been preempted, that a railroad is not guilty of negligence in blocking such crossing without providing additional warnings unless special circumstances make the crossing peculiarly hazardous, and that the burden of showing such special circumstances rests upon the party suing the railroad. *Reames*, 359 S.W.2d at 236[7]; *Allinson*, 347 S.W.2d at 905[1].

We acknowledge, of course, that the facts in the instant case differ from *Reames* and *Allinson*. Here, Jack's Torino and M–K–T's locomotive were both moving when the impact occurred, and the

---

4. Footnote 1, *supra.*

5. At the request of M–K–T, the trial court gave an instruction hypothesizing that Jack was negligent in (a) driving his Torino while intoxicated, or (b) failing to keep a careful lookout. In connection with the submission of intoxication, there was evidence that laboratory tests of blood taken from Jack's body within two hours after the accident showed .23 per cent by weight of alcohol based upon grams of alcohol per 100 milliliters of blood.

front of the locomotive struck the side of the Torino. We see no reason, however, why the rule that the burden of showing special circumstances making the crossing peculiarly hazardous rests upon the party suing the railroad should not apply here. The rule was applied in *Zickefoose v. Thompson*, 347 Mo. 579, 148 S.W.2d 784, 790[6] (1941), where a motorist drove his truck into a moving boxcar at a crossing. The boxcar was the middle one in a string of five, and the train, which had been stopped in the crossing, had begun moving at a slow speed. The opinion stated that a motorist driving into the side of a standing or moving train at a grade crossing, even at night, cannot recover in the absence of special circumstances rendering the crossing peculiarly hazardous, and that the burden is on the party suing the railroad to show such circumstances. *Id.*

Applying *Reames, Allinson,* and *Zickefoose,* we hold that inasmuch as one element of plaintiffs' theory of liability against M–K–T was that the crossing, at the time of the collision, was unusually dangerous, the burden was on plaintiffs to present evidence sufficient to support an affirmative finding as to that element.

In deciding the question of evidentiary sufficiency, we are guided by the principles articulated in *Houghton v. Atchison, Topeka & Santa Fe Railroad Co.*, 446 S.W.2d 406, 408–09[1–5] (Mo. banc 1969). There, an automobile struck the rear car of a train as the train was leaving a crossing at four or five miles per hour. The incident occurred at night in a rural area. The motorist contended that the movement of the train across the blacktop county road created an unusually dangerous and hazardous crossing, and that the railroad was negligent in failing to warn him. In determining whether a submissible case was made on those grounds, the Supreme Court stated that the evidence would be considered in the light most favorable to the motorist's contentions, accepting as true all that is not entirely unreasonable or contrary to physical facts or natural laws and giving the motorist the

benefit of all favorable inferences that reasonably could be drawn from the evidence. However, the case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis; that is, liability cannot rest upon guesswork, conjecture, or speculation beyond inferences reasonably to be drawn from the evidence. The question whether the evidence in a given case is substantial is one of law for the court.

In the instant case, in assessing the evidence on the issue whether the crossing was unusually dangerous, we are guided by what we perceive to be the mode of analysis employed in *Jenkins*, 322 S.W.2d 788. There, the motorist approached the crossing from the north, and the train approached it from the west. The opinion, in determining whether the evidence was sufficient to permit a jury to find that the crossing was dangerous, focused its attention on the hazards endangering a motorist approaching the crossing from the north when a train was approaching it from the west. The opinion, at least inferentially, recognizes that a crossing might be unusually dangerous to a motorist approaching it from a given direction when a train approaches it from a given direction, while the same crossing may present no unusual danger if the motorist or the train approaches from a different direction.

The soundness of this approach is illustrated by the photograph (Defendant's Exhibit K–1) in the instant case. The building situated in the acute angle formed by the north edge of the road and the east rail of the track is a visual obstruction for a motorist approaching the crossing from the east (as Jack did), when a train approaches the crossing from the northeast. Because of the building, the motorist is unable to see up the track to the north any appreciable distance until he is close enough to the crossing to see around the southwest corner of the building. Additionally, to a motorist approaching the crossing from the

east, a train approaching from the northeast is approaching on the passenger side of the automobile at an angle 135 degrees from the motorist's line of vision as he looks straight ahead.

By contrast, when a train approaches the crossing from the southwest and a motorist approaches the crossing from the east (the circumstances in the instant case), there is nothing to obstruct the motorist's view as he looks down the track to his left (southwest).[6] Additionally, the train is approaching the automobile from the driver's side at an angle only 45 degrees from the driver's line of sight as he looks straight ahead.

Consequently, in determining whether the evidence was sufficient to support a jury submission that the crossing here was unusually dangerous, we confine our study to the question whether the crossing was unusually dangerous to a motorist approaching it from the east (as Jack did) when a train approaches from the southwest (as M–K–T's train did) during daylight.

We point this out because plaintiffs, in listing the factors that they believe made the crossing unusually dangerous, include the difficulty encountered by a motorist approaching the crossing from the east in seeing to his right, due to the angle of the crossing and the building obstructing his view in that direction.[7] That factor, in our opinion, is irrelevant, as M–K–T's train was not coming from that direction.

■ Having defined the scope of our inquiry, we now examine the evidence regarding the danger at the crossing, viewing it in the light most favorable to plaintiffs.

The weather was clear and cold, and, as the accident happened on December 20, the sun was as low in the sky as it ever is at the time of day the collision occurred, 3:55 p.m. There was testimony that the sun was "shining brightly right above the engine," and that the sun was "behind the train." There was only one sign—a "crossbuck"—warning a motorist approaching from the east of the presence of the track. That sign, mounted on a wooden pole, faced east and was situated west of the track near the north edge of the road. The words "RAILROAD CROSSING" appeared on the arms of the sign in black letters against a white background.

Massie characterized the crossing as "rough." The road surface was described as gravel and embedded rock. Photographs show that the road surface between the rails consisted of large boards lying side by side, parallel to the rails. Massie also testified that the road curved "just prior to the track"; however, photographs demonstrate that the "curve" was negligible. The road was about 18 feet wide.

Additionally, plaintiffs point out that because the day was cold, it could be reasonably assumed that Jack's car windows were up, making it more difficult for him to hear a train whistle. Finally, plaintiffs note that although the Clinton Switcher ran six days a week, it did not arrive at the crossing at a scheduled time.

The foregoing conditions, as we understand it, are those that plaintiffs contend were sufficient to authorize a finding that the crossing was unusually dangerous. Assuming the crossing was unusually dangerous, plaintiffs maintain that engineer Journot's operation of the train was, by reason of the unusual danger, negligent.

The evidence most favorable to plaintiffs regarding Journot's operation of the train

---

6. We do not overlook Massie's testimony that a motorist approaching the crossing from the east could not see a train approaching from the southwest until the train "cleared the trees 400 feet from the crossing." Although no such trees are shown in Defendant's Exhibit K–1, appended hereto, other photographs show trees along the east side of the track a considerable distance southwest of the crossing. We assume those trees are the ones to which Massie referred.

7. In addition to the building shown in the photograph, plaintiffs presented evidence that at the time of the collision there were some "telephone boxes" north of the road and east of the track that obstructed the view of a motorist approaching the crossing from the east and attempting to look north.

is that it approached the crossing at 31 miles per hour. Journot, who occupied the engineer's seat on the right-hand side of the locomotive, testified on deposition that he first noticed Jack's Torino when it turned onto the gravel road from Highway 54. At that time, the locomotive was about 1,144 feet southwest of the crossing. The distance along the gravel road from Highway 54 to the east rail of the track is about 422 feet. Journot estimated the Torino's speed as 10 miles per hour when he first saw it, and he testified that its speed remained constant until it was about 100 feet from the crossing. At that point, according to Journot, the Torino slowed "a little bit."

Journot recalled that he sounded the locomotive's whistle "about the same time I saw this vehicle." Journot explained that he assumed the Torino was going to stop until the locomotive was about an "engine length" (approximately 60 feet) from the crossing. Then, Journot realized the Torino was not going to stop, so he activated the emergency braking system while continuing to sound the whistle.

Journot remembered seeing Jack look toward the locomotive just before the collision. Journot testified: "[H]e looked up and he was in shock, it was just like, 'Where did the train come from?' And I was wondering why he didn't see me, so— that was the first time I really saw his face, though."

In *Hess v. Chicago, Rock Island and Pacific Railroad Co.*, 479 S.W.2d 425 (Mo. 1972), a two-lane asphalt road crossed a railroad track in St. Louis County. A southbound motorist was injured when the front of his slowly moving automobile was struck at the crossing by an eastbound locomotive traveling 35 miles per hour. The motorist sued the railroad for personal injuries, but a jury found for the railroad. On appeal, the motorist assigned error in the trial court's refusal to give an instruction submitting that the crossing was unusually dangerous, and that the railroad consequently should have provided additional warning of the approach of its train.

There was evidence that because of crops and high weeds near the track, the motorist, as he approached the crossing, could not see up the track to his right, the direction whence came the train. Additionally, there was an incline leading up to the track, and the train was several hours late. The engineer, who had been sounding the bell and whistle, did not see the automobile until the locomotive was within 100 feet of it. In affirming the judgment, *Hess* noted that the crossing was in a relatively rural area, that there was no showing that the traffic was heavy on the road at the time of the accident, that the track was straight, and that the angle of approach was not such as in itself would have obscured a motorist's vision. The motorist, who testified that he stopped his vehicle when he was five to six feet from the track, conceded he did not again look to his right as he started toward the crossing. The opinion, observing that the evidence did not establish that the motorist's view to the west would have been obstructed from the position where he said he had stopped, held that the crossing was not so unusually hazardous that the railroad could be found negligent in not providing a flasher light, crossing gate, or bell to warn motorists of the train's approach.

In *Duncan v. Chicago, B. & Q.R. Co.*, 149 S.W.2d 920 (Mo.App.1941), a westbound train going 65 miles per hour at night struck a motorist's truck that had stalled on the track. The motorist, by means of a flare, had attempted, without success, to warn the train as it approached. The crossing was on a gravel farm-to-market road about two miles from the nearest town. Because of a curve in the track east of the crossing, the locomotive's headlight did not shine on the track until the locomotive was about 400 feet from the crossing. The motorist asserted liability against the railroad for damage to his truck solely on the theory that the train was operated at an excessive speed. He prevailed at trial, but the judgment was reversed on appeal. The opinion took note of the rule that where the conditions of a country railroad crossing make it more than ordinarily haz-

ardous or dangerous, there may be a speed at which the operation of a train through the crossing is negligent. *Id.* at 923. Finding no circumstances sufficient to make the crossing unusually dangerous, the opinion held that the railroad's demurrer to the evidence should have been sustained.

In *Jenkins, Branson, Hess,* and *Duncan,* each of which has now been discussed, a moving locomotive struck a motor vehicle at a railroad crossing outside a municipality. In *Jenkins* and *Hess,* the motor vehicle was moving in the crossing when the impact occurred. In *Branson* and *Duncan,* the motor vehicle was motionless on the track, and the motorist was approaching the train on foot in an attempt to signal it. These four cases, among all those cited by the parties, are, in our view, factually closest to the instant case.

*Coffman v. St. Louis-San Francisco Railway Co.,* 378 S.W.2d 583 (Mo.1964), heavily relied on by plaintiffs, is factually dissimilar. There, a locomotive pulling a westbound freight train at 36 miles per hour collided with a northbound station wagon after dark at a crossing in the city of Rolla, which then had a population approximating 18,000. The station wagon was traveling on a street described as "one of the major streets of the city." There was no contention that the train's speed was excessive. Instead, the plaintiff, a passenger in the station wagon, contended that because of the configuration of the crossing and the presence of objects obstructing the view of a northbound motorist to the east, the crossing was unusually dangerous and hazardous, and the railroad should therefore have provided a flasher signal, bells, watchman, or other warning device to signal northbound motorists of the approach of westbound trains.

The first factor listed in *Coffman* in itemizing the conditions and circumstances to be considered in determining whether a crossing is unusually dangerous and hazardous is "the location of the crossing in an urban area." That factor, of course, is absent in the instant case. Another factor listed in *Coffman* is "the extent of the use of the crossing by the traveling public." In *Coffman,* the street that crossed the track was a major street. In the instant case, plaintiffs make no contention that the road on which Jack was driving carried any appreciable volume of traffic. Given these fundamental differences, *Coffman's* holding that the injured party made a submissible case that the crossing there was unusually dangerous and hazardous does not aid plaintiffs in the instant case.

Here, the crossing was some three miles outside Nevada, there was no evidence that the crossing lay in a substantially populated rural area, the track and the road were essentially flat and straight, there was nothing to obstruct Jack's view for several hundred feet to the southwest (the direction from which M–K–T's train was coming), the train approached the crossing on the driver's side of Jack's Torino at an angle only 45 degrees or so from Jack's line of sight as he looked straight ahead, Jack's Torino was visible from the locomotive when the Torino was more than 400 feet east of the crossing and the locomotive was more than 1,100 feet southwest of the crossing, and there was no evidence that the crossing was extensively used by the traveling public.

Measuring the evidence here by *Jenkins, Branson, Hess,* and *Duncan,* we hold that plaintiffs failed to make a submissible jury issue on whether the crossing was unusually dangerous. As M–K–T aptly observes in its brief, if the crossing in this case justifies an "unusually dangerous" submission, then there is likely no crossing in Missouri that could not be so characterized.

■ Any issue submitted to a jury in an instruction must be supported by evidence from which the jury could reasonably find such issue, *Eichelberger v. Barnes Hospital,* 655 S.W.2d 699, 705[15] (Mo.App.1983); *Baker v. Brinker,* 585 S.W.2d 256, 258[1] (Mo.App.1979), and an instruction which submits an issue that is not supported by the evidence is erroneous, *Wired Music, Inc. v. O'Brien,* 556 S.W.2d 459, 461–62[6] (Mo.App.1977). Having concluded that the evidence was insufficient to support a find-

ing that the crossing was unusually dangerous, we hold that the trial court committed reversible error in submitting that issue to the jury in paragraph "Second" of Instruction 6.[8] *Pasternak v. Mashak*, 392 S.W.2d 631, 640[15] (Mo.App.1965), *appeal after remand*, 428 S.W.2d 565 (Mo.1967), *cert. denied*, 390 U.S. 907, 88 S.Ct. 821, 19 L.Ed.2d 872 (1968).

Plaintiffs, in an effort to avoid reversal in the event that the giving of Instruction 6 be held erroneous, argue in their brief that the submissibility of excessive speed by a train requires the "unusually hazardous crossing doctrine" only in instances where there is no applicable statute or ordinance governing the speed of the train. In support of this contention, plaintiffs cite *Duncan*, 149 S.W.2d at 922[1], for the proposition that in the absence of a statute or duly authorized municipal ordinance restricting the speed at which trains may be run, no rate of speed at crossings is negligence per se. Plaintiffs assert that in the instant case, the maximum allowable speed for M–K–T's train at the crossing where Jack was killed was 25 miles per hour.

The evidentiary basis for this contention is that Massie testified that the track at the accident site had been classified by the "Federal Government" as a "Class II track," and that the "maximum allowable speed" on a track of that class is 25 miles per hour. M–K–T's "Assistant Vice President-Mechanical" conceded that the maximum speed allowed on a Class II track for a freight train is 25 miles per hour.

The "Federal Government" action to which Massie referred was evidently 49 C.F.R. § 213.9(a), which, subject to certain exceptions listed therein, sets certain "maximum allowable operating speeds" for freight trains and for passenger trains over various classes of track. Although not fully developed in the record, it appears that the regulation was adopted pursuant to the Federal Railroad Safety Act of 1970, 45 U.S.C.A. § 421, *et seq.* (West 1972), as amended. Plaintiffs maintain that inasmuch as the speed of M–K–T's train exceeded 25 miles per hour as it approached the crossing, M–K–T was guilty of negligence per se, and that the question whether the crossing was unusually hazardous "was a superfluous issue for the jury's consideration."

We need not, on this appeal, decide whether, by reason of 49 C.F.R. § 213.9(a), the operation of M–K–T's train at a speed exceeding 25 miles per hour was negligence per se. That is because plaintiffs' theory of liability, as submitted in Instruction 6, was that it was the *unusually dangerous character of the crossing* that made the speed of 31 miles per hour excessive, and therefore negligent. Plaintiffs did not attempt to assign blame for Jack's death to M–K–T on the ground that the speed of 31 miles per hour, standing alone, constituted negligence. Whether such a theory of liability would have been tenable is a question we decline to address.

Having decided that the judgment for plaintiffs must be reversed because Instruction 6 erroneously submitted the "unusually dangerous crossing" issue, we would not normally address M–K–T's other assignments of error. However, as the cause may be retried, we feel obliged to resolve the issue whether Massie's opinion that the crossing was "unusually hazardous" should have been allowed in evidence.

■■■■ The rules regarding admissibility of opinions of experts are easily stated, if not easily applied. Expert witnesses, because of their superior knowledge, are called upon to state conclusions of fact respecting a subject concerning which persons without special skill or experience are incapable of deducing correct conclusions. *City of St. Louis v. Kisling*, 318 S.W.2d 221, 225[7] (Mo.1958). Opinion testimony of an expert witness should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved. *Sampson v. Missouri Pacific Railroad Co.*, 560 S.W.2d 573, 586[17] (Mo. banc

**8.** Footnote 1, *supra.*

1978); *Cole v. Empire District Electric Co.*, 331 Mo. 824, 55 S.W.2d 434, 437–38[3] (1932). The essential test of admissibility of expert opinion evidence is whether it will be helpful to the jury. *Parlow v. Dan Hamm Drayage Co.*, 391 S.W.2d 315, 325–26[16] (Mo.1965).

■ So far as we can determine, no Missouri appellate court has decided whether an expert may express his opinion on the question whether a railroad crossing is unusually dangerous. However, in *King v. Missouri Pac. Ry. Co.*, 98 Mo. 235, 11 S.W. 563 (1889), a case involving a collision between a freight train and a wagon at a crossing on a public road, several witnesses, none of whom were qualified as experts, were asked their opinion as to whether the crossing was dangerous for a stranger. Noting the general rule that witnesses must state facts, and not give their opinions, and that there was nothing in the case which took it out of the general rule, the opinion held that the witnesses should have been required to state the facts disclosing the location and surrounding at the crossing, and from those facts the jury could determine whether the crossing was dangerous or not. 11 S.W. at 564.

The issue whether an expert's opinion that a railroad crossing is abnormally dangerous is admissible was squarely before the Supreme Court of Arkansas in *St. Louis Southwestern Railway Co. v. Jackson*, 242 Ark. 858, 416 S.W.2d 273 (1967). There, the occupants of an automobile were killed when it collided with a train at a country crossing. The expert, on the basis of the following factors, concluded that the crossing was abnormally dangerous: the type of highway, the speed of automobiles approaching the crossing, the approach to the crossing (a straight level highway), the advance warning signs, the number of vehicles that daily crossed the crossing, the number of trains that daily passed the crossing, the speed of the trains, the angle of the approaches (right angles), obstruction to vision of motorists, obstruction to vision of train crews, recent accidents that had occurred under similar conditions, dis-

tractions to motorists, railroad crossing signals, the kind of day, and the position of the sun.

Emphasizing that not one of those factors taken individually was beyond the comprehension of the average juror, and that there was no apparent reason why an average juror would not be competent to determine from those factors, considered together, whether the crossing was abnormally dangerous, the court held that it was reversible error to allow the expert to testify that the crossing was abnormally dangerous. 416 S.W.2d at 280–81[11].

In *Hughes v. Wabash R. Co.*, 342 Ill.App. 159, 95 N.E.2d 735 (1950), a motorist was killed when his automobile was struck by a train at a crossing. An expert was permitted to testify that a hypothetical railroad crossing, which, as described, was identical to the crossing in the case, was an extra hazardous crossing. This was held reversible error. 95 N.E.2d at 741–42.

In *Martindale v. City of Mountain View*, 208 Cal.App.2d 109, 25 Cal.Rptr. 148 (1962), the driver of a pickup was killed when his vehicle was struck by a train at a crossing. The decedent's widow and children called a safety engineer as a witness and asked him a hypothetical question calling for an opinion as to whether the condition at the crossing was hazardous to motorists attempting to cross the tracks. An objection was sustained, and the ruling was upheld on appeal. 25 Cal.Rptr. at 157–58[11].

Rejection of similar testimony by trial courts in *Russell v. Mississippi Central Railroad Co.*, 239 Miss. 741, 125 So.2d 283 (1960), and *Bridges v. Union Pacific Railroad Co.*, 26 Utah 2d 281, 488 P.2d 738 (1971), was likewise upheld on appeal.

We find the authorities just discussed persuasive when applied to the record here. None of the factors relied on by Massie in forming his opinion in the instant case was beyond the ken of the average juror, and— had plaintiffs made a submissible case on the issue—we see no reason why twelve jurors could not have determined from all of the evidence whether the crossing was

unusually dangerous. Accordingly, we hold that in the circumstances of this case, the issue whether the crossing was unusually dangerous was not an issue upon which Massie should have been allowed to express an opinion. Having decided that, we need not decide whether Massie was qualified to express such an opinion.

Plaintiffs, arguing that Massie's opinion that the crossing was unusually hazardous was admissible, cite *Williamson v. St. Louis-San Francisco Ry. Co.*, 335 Mo. 917, 74 S.W.2d 583 (1934), and *Young v. Wheelock*, 333 Mo. 992, 64 S.W.2d 950 (1933), *cert. denied*, 291 U.S. 676, 54 S.Ct. 527, 78 L.Ed. 1064 (1934). Neither is helpful. *Williamson* concerned the admissibility of the opinion of an experienced switchman on the issue whether two railroad car couplers would couple automatically by impact under certain conditions. *Young* concerned the admissibility of the opinion of a locomotive engineer as to what speed by a particular train on a particular grade and curve under various conditions would tend to cause derailment. The witness also testified that certain defects in the track would tend to cause derailment, and that the engine wheels would not run over certain debris on the track. Obviously, the subjects on which the experts expressed opinions in *Williamson* and *Young* were matters beyond the experience and knowledge of jurors.

Plaintiffs direct our attention to cases from other jurisdictions in which experts' opinions have been allowed regarding railroad crossings, but we find those cases factually different to such a degree that they are not persuasive.

In *Merchants National Bank of Aurora v. Elgin, Joliet & Eastern Railway Co.*, 121 Ill.App.2d 445, 257 N.E.2d 216 (1970), *aff'd*, 49 Ill.2d 118, 273 N.E.2d 809 (1971), factory buildings in the area of the crossing were lighted from the outside and in the parking areas, and there was testimony that the crossing, with no lights, appeared to get darker than it would when the lighting was constant. Lights of trains would be horizontally aligned with building lights.

There was also testimony that boxcars were on a factory siding several hundred feet north of the crossing, the direction from which the train approached. Additionally, there was evidence that a switch train of eight cars was south of the crossing and that another switch train with headlights and eight cars was north of the crossing. A passenger in an automobile was killed when the automobile was struck in the crossing by a moving freight train. Negligence was charged against the railroad in failing to install adequate visual, physical, and audible warning devices at the crossing, operating the train at excessive speed, failing to apply the brakes, failing to keep a proper lookout, and failing to blow a whistle. An engineer testified regarding standards promulgated by the appropriate state agency regarding crossings. There was evidence as to the number of trains and motor vehicles that passed the crossing each day. Another expert with a background in the study, practice, and theoretical aspects of grade crossing protection testified that the crossing was "very inadequately protected," and that a minimum adequate protection would have been flashing lights and bells. On appeal, receipt of the testimony was upheld.

In *Shutka v. Pennsylvania Railroad Co.*, 74 N.J.Super. 381, 181 A.2d 400 (1962), the issues submitted to the jury included whether the grade crossing was extra-hazardous. A traffic consultant with extensive credentials was permitted to testify as to the conditions at the crossing and the standards applicable to such conditions. There is no indication that he expressed an opinion on whether the crossing was extra-hazardous. Admission of the testimony was held proper.

In *Southern Pacific Co. v. Watkins*, 83 Nev. 471, 435 P.2d 498 (1967), the collision occurred where a highway crossed twelve sets of railroad tracks which formed part of a switching yard. The crossing had an estimated auto traffic of 4,300 vehicles per day, and train traffic averaging 8,500 per year, in addition to 10 to 55 switching operations crossing the roadway daily. There

were no electronic gates, gongs, or other devices to warn motorists of the approach of trains. An expert in traffic control was permitted to testify that the crossing was very dangerous. In upholding admissibility, the opinion noted that there was a great mass of facts and data for the jury to digest, including the volume of motor vehicle traffic, the volume of passenger and freight train traffic, the daily switching operations, the number of tracks and their grade of descent, the rate of train speed, the rate of motor vehicle speed, the accident ratio, the calculations as to exposure time on the tracks, the noise level at the crossing, extensive material on light readings maintained by the railroad in the area, the reflectance value of the luminaries, ratio of light levels, the glare factor, and existence of hazards to visibility. 435 P.2d at 508.

In the instant case, the jury was not confronted by evidence similar to that in *Merchants National Bank, Shutka* or *Southern Pacific.* That being so, there was no need for Massie's opinion on whether the crossing was unusually hazardous. The trial court prejudicially erred in receiving in evidence Massie's opinion on that issue.

Having now disposed of M–K–T's first two assignments of error, we reach its third point, which maintains that the trial court erred in giving Instruction 6,[9] in that there was no substantial evidence to support a finding that engineer Journot knew or could have known that there was a reasonable likelihood of collision in time thereafter to have stopped the train, but failed to do so.

An examination of the second submission of negligence in paragraph "Third" of Instruction 6 reveals that negligence was hypothesized in Journot's failure to have (1) slackened speed *or* (2) stopped the train, at a time when he knew or could have known that there was a reasonable likelihood of collision. M–K–T's third point does not contend that plaintiffs failed to make a submissible issue as to *slackening* speed.

We point this out only because M–K–T asks that the judgment for plaintiffs be reversed outright.

Evidence favorable to plaintiffs indicated that had the locomotive reached the point of impact one second later than it did, Jack's Torino, at the speed it was traveling, would have had time to clear the crossing. Journot, as already noted, testified that the speed of the Torino remained constant at approximately 10 miles per hour as it approached the crossing, until it slowed "a little bit" the last 100 feet. Bearing in mind that Journot saw the Torino when the locomotive was over 1,100 feet from the crossing and the Torino was over 400 feet from the crossing, that although Journot was blowing the whistle the Torino did not decrease its speed, and that even a slight slackening of the train's speed prior to the time that Journot put the train into "emergency" might have supplied Jack the one second needed for his Torino to have passed the crossing, we are unwilling to hold, on this appeal, that plaintiffs, on remand, would be unable to make a submissible case on failure to slacken. Consequently, outright reversal would not be the proper disposition. *Yarrington v. Lininger,* 327 S.W.2d 104, 111[15] (Mo.1959).

Having earlier decided that the judgment for plaintiffs must be reversed for the reasons assigned in M–K–T's first two points, we need not decide whether plaintiffs made a submissible case of negligence on Journot's failure to *stop* the train after he knew or could have known that there was a reasonable likelihood of collision. Accordingly, we express no opinion on the merits of M–K–T's third point.

M–K–T's fourth point assigns error in the failure of Instruction 6 (patterned on MAI 17.04 [1978 Revision]) to include, at the end of paragraph "Third," the phrase "but W.M. Journot failed to do so." This, of course, was error, but it is before us only for plain error review, as M–K–T concedes it was not preserved in the motion for new trial. Inasmuch as the cause is

**9.** Footnote 1, *supra.*

being remanded and the error likely will not occur at retrial, we need not decide whether the omission constituted plain error requiring reversal.

M–K–T's fifth point attacks the verdict form supplied the jury by the trial court. At the time this cause was tried, the Supreme Court of Missouri had not yet approved a form of verdict for use in cases tried under the doctrine of comparative fault.

On January 24, 1986, the Supreme Court of Missouri adopted and approved MAI 37.-07 [1986 New], a form of verdict for cases such as this. See p. XLV, West's Missouri Cases advance sheet dated February 25, 1986, 702 S.W.2d No. 1, pages 57–162. The new form is effective September 1, 1986. As this cause is being remanded, the Supreme Court's approval of the above mentioned verdict form makes it unnecessary for us to address M–K–T's fifth point.

M–K–T's sixth, and final, assignment of error faults the trial court for failing to define the term "unusually dangerous." Inasmuch as we have held that the evidence was insufficient to support a submission to the jury that the crossing was unusually dangerous, and as it appears that no stronger evidence will be available to plaintiffs on that issue at retrial, we need not address point 6.

▉ We now turn to Jackie Jo's appeal, number 13986. Her sole point is that the trial court erred in dismissing a count of her petition that undertook to plead a cause of action against M–K–T on the theory of "strict liability in tort."

Jackie Jo explains that the dismissed count invoked liability on the basis of *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo.1969), and MAI 25.04 [1978]. Jackie Jo summarizes the elements of such a cause of action thusly:

"(1) The defendant sold/placed in commerce the product in the course of the defendant's business;

(2) The product when sold/placed in commerce was in a defective condition, unreasonably dangerous when put to a reasonably anticipated use;

(3) The product was used in a manner reasonably anticipated; and

(4) Damages occurred as a direct result of such defective condition."

Jackie Jo insists that the crossing where Jack was killed was a "product," that M–K–T placed the product in commerce in the course of its business, and that the product was unreasonably dangerous when put to a reasonably anticipated use, in that (a) there were no audible or visual signals warning motorists of approaching trains, (b) the crossbuck was not adequate to warn motorists that they were approaching a railroad crossing, and (c) unscheduled trains passed through the crossing.

We hold that the crossing was not a "product" within the meaning of that term in the doctrine of strict liability in tort, 2 Restatement, Law of Torts, Second, § 402A, adopted in *Keener*, 445 S.W.2d at 364. In *Gunderson v. Sani-Kem Corp.*, 674 S.W.2d 665, 668 (Mo.App.1984), it is explained that under that doctrine, liability is imposed on all those in the chain of placing a defective product in the stream of commerce, and the product need not be actually sold if it has been injected in the stream of commerce by other means. The opinion states: "Under the stream-of-commerce approach to strict liability no precise legal relationship to the member of the enterprise causing the defect to be manufactured or to the member most closely connected with the customer is required before the courts will impose strict liability; it is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product which calls for the imposition of strict liability." *Id.*

The record reveals that M–K–T, at the crossing site, "has an easement in and to its right of way, over which the grade crossing was installed, presumably by duly authorized officials of Vernon County, Missouri." It thus appears that M–K–T does

not own the land at the place where its track crosses the road, but has only an easement to run its track over the road.

Additionally, it is manifest that M–K–T has not sold, leased, loaned, given, or supplied the crossing to any customer or consumer. The crossing is nothing more than a place on the surface of the earth where M–K–T's track lies across a public road. Travelers on the road are obliged to cross M–K–T's track in order to reach their destinations. In passing over M–K–T's track at the crossing site, travelers are not, by any stretch of the imagination, consumers or users of anything sold, leased, loaned, given, supplied or placed in commerce by M–K–T. They are simply persons who must get from one side of M–K–T's track to the other, and in doing so they pass over the track where it intersects the road.

There are well established rules of law governing the liability of railroads for accidents at crossings, and such rules have been extensively discussed in that portion of the opinion dealing with M–K–T's appeal. We decline to disturb those rules by applying *Keener* to the circumstances here.

For an analogous case where a strict liability theory was rejected, see *Ruiz v. Southern Pacific Transportation Co.*, 97 N.M. 194, 638 P.2d 406 (Ct.App.1981).

That portion of the judgment dismissing the count of Jackie Jo's petition endeavoring to plead a cause of action against M–K–T on the theory of strict liability in tort is affirmed.

Dixie, like Jackie Jo, included a count in her petition purporting to plead a cause of action against M–K–T on the theory of strict liability in tort. The trial court similarly dismissed that count of Dixie's petition. Dixie did not appeal. The portion of the judgment dismissing that count of Dixie's petition is likewise affirmed.

The portion of the judgment wherein Jackie Jo and Dixie are awarded $200,000 damages against M–K–T is reversed, and the cause is remanded for a new trial consistent with this opinion.

HOGAN, P.J., and MAUS, J., concur.

PREWITT, C.J., concurs in result and files concurring opinion.

APPENDIX

Defendant's Exhibit K–1

PREWITT, Chief Judge, concurring.

I agree with the principal opinion except as to its statement that "the difficulty encountered by a motorist approaching the crossing from the east in seeing to his right" is irrelevant as the train was not coming from the decedent's right.

I believe the view in both directions is relevant. A motorist ordinarily would, or should, look in both directions. In an effort to see around or past obstructions, or to look at a difficult angle, it might take a motorist longer than it would if the view was clear, leaving less time to look in the other direction.

Although I believe that Jackie Leroy Hendricks' view of the railroad tracks to his right is relevant, and a factor to be considered in determining whether he entered an unusually dangerous crossing, that view is not of sufficient significance here to change the result because of the other factors regarding the crossing covered in the principal opinion. I agree that the evidence was insufficient for the jury to have found that this was an unusually dangerous crossing for a motorist proceeding as Hendricks was with a train approaching from his left.